# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

YUMAR ANTONIO BURKS,

Defendant-Appellant.

FOR PUBLICATION
December 2, 2014
9:00 a.m.

No. 314579
Ingham Circuit Court
LC No. 11-000565-FC

Before: WILDER, P.J., and FITZGERALD and MARKEY, JJ.

WILDER, J.

Defendant appeals as of right his convictions by a jury of felony murder of his six-month-old son Antonio Burks, MCL 750.316, and first-degree child abuse, MCL 750.136b(2). On the felony murder conviction, the trial court sentenced defendant to life imprisonment. Defendant was sentenced to 50 to 180 months in prison on the first-degree child abuse conviction. We find that while the trial court erred by refusing to instruct the jury regarding second-degree child abuse, MCL 750.136b(3), the error was harmless. Accordingly, we affirm.

I

The evidence at trial demonstrated that defendant had been feeling stress and frustration because he could not find a job that would provide for his family. Sheretta Lee, who is defendant's ex-wife and Antonio's mother, testified that several weeks before Antonio's death, when defendant drove her to work with two of their children, he threatened to drop her and the children off and then drive off a cliff. Lee was frightened because of his statements and his erratic driving, and when she got to work, defendant drove away with the children at such a high rate of speed that the tires on the car left skid marks. Lee called the police, who later confirmed the children were not harmed. While Lee never saw defendant slap or punch Antonio, when Antonio was three months old, defendant began giving the baby hickies on his cheeks. Lee also testified that Antonio cried a lot and that defendant would get frustrated trying to calm the baby down.

Lee further testified that, on the morning of March 24, 2011, defendant expressed frustration with his temporary employment agency, punched several holes in the walls, and told her "that could have been you." When Lee thought that defendant had calmed down, she left to take the couple's two older children to daycare and to go to work, leaving Antonio in defendant's sole care and custody.

-1-

Travis Parris, defendant's friend and neighbor, testified that defendant came over to play video games at around 5:00 p.m. A few hours later, Parris told defendant to go home and check on Antonio. Parris called defendant several times after he left, but defendant did not answer. When Lee returned home with the older children around midnight, defendant put one of the children to bed while the child was still fully clothed with his coat and shoes. Defendant also instructed Lee not to wake Antonio.

Lee testified that she went to bed, while Parris testified that defendant again visited his house. However, Parris said that on this visit, instead of playing video games, defendant just sat on the couch, which was not normal for him. Lee testified that she woke up at around 3:00 a.m., when she heard defendant pacing the room, and again, at around 10:00 a.m., when she got up for the day. When she touched Antonio, she discovered that he was very cold, and that he had bruising all over his body that had not been there the previous day. Lee called 911, and relayed instructions to defendant on how to perform CPR on a baby by using only two fingers.[1]

Upon arriving on the scene, the police found defendant performing adult CPR on the infant. A responding officer pulled defendant off the baby so that he could perform infant CPR, but the baby was cold and lifeless. Officer Scott Sexton observed injuries on the baby's body, but significantly, there was no bruising in the area where defendant was performing CPR. A firefighter who had responded to the scene testified that, when he removed the baby's diaper, he noticed that the diaper was dry and the baby had been freshly powdered. He found this unusual because the bowels and bladder release upon death. In the aftermath of the police arrival at the scene, defendant was observed punching holes in the drywall.

The baby was then taken to the hospital by paramedics. The treating emergency physician, Dr. Martin Romero, declared the baby dead and opined that he had been dead for between 4 and 24 hours. Dr. Romero observed multiple bruises and abrasions on the baby's face, abdomen, and legs, healing bruises on his arms, a torn frenulum,[2] and "Cullen's sign," a purple discoloration of the abdomen that indicates internal bleeding. Dr. Romero also observed that Antonio's diaper was clean and testified that stool and urine are expelled at the time of death.

The forensic pathologist, Dr. John Bechinski, who performed the autopsy on the baby, testified that Antonio had died as a result of multiple blunt force trauma. The doctor's internal examination revealed two areas of bleeding under the scalp, a full thickness tear of the superior vena cava, bleeding in the cavity next to the heart, bruises to the surface of the lungs, bleeding within the lungs, four liver lacerations, two spleen lacerations, bleeding in the abdominal cavity, a thick hemorrhage around the left testicle, bruising on the diaphragm, thymus, colon, and

---

[1] A police officer testified at trial that the method for performing CPR on an adult differs from the method for performing CPR on a child or an infant. Chest compressions for an adult involve both hands, but only two fingers for a child or an infant. Moreover, to perform mouth-to-mouth on a child or infant, both the mouth and nose should be covered to create a seal.

[2] Dr. Romero testified that the frenulum is a tag of skin under the upper lip.

duodenum, bleeding around the right adrenal gland, and pulpification of that same adrenal gland. Dr. Bechinski opined that the number, location, and severity of the internal injuries were inconsistent with improperly performed CPR and were possibly caused by squeezing, punching, shaking, or being struck against a wall. Dr. Bechinski equated the force required to cause the injuries to Antonio's vena cava and next to his heart to the force involved with a high-speed vehicle collision. Dr. Bechinski testified that the photos of Antonio's injuries resembled those in forensic pathology textbooks of battered children.

Defendant made several conflicting statements to the police. When first interviewed, defendant only admitted giving Antonio hickies on the cheek and occasionally pinching and slapping Antonio when he was fussy. In a second interview, defendant stated that he did not slap Antonio and that he was always gentle with him. Defendant further stated that Antonio had fallen off of the bed five different times in the past and that was how he had become so bruised. In a third interview, defendant stated that Antonio must have been injured by his three-year old sibling who pulled him off the bed and punched him. Defendant later changed his story again and said that he had fallen asleep next to Antonio and had accidently rolled on top of him. When he awoke, Antonio was gasping for air. Defendant said he shook Antonio and punched his sides in an effort to revive him. Defendant also said he put Antonio in the bath to revive him and that he dropped Antonio onto the side of the tub when he attempted to lift him out. Defendant further stated that he cleaned the baby and put him to bed, intending to take him an urgent care facility in the morning.

At trial, defendant admitted that he had not been completely truthful in his interviews with the police, but asserted that his third statement to the police had been the most truthful. Defendant testified that around 10:00 p.m., he lay down on the bed with Antonio to take a nap and that he rolled over onto Antonio for a roughly a minute. When he awoke, Antonio was having difficulty breathing. Defendant testified that he performed CPR on Antonio, who appeared to be alright afterward. Defendant further testified that he then gave Antonio a bath, and that he stepped out of the bathroom momentarily, at which time Antonio became partially submerged in the bathtub. Defendant claimed he pulled Antonio out of the water and again successfully performed CPR. But defendant also admitted that he had struck Antonio while performing CPR to get the baby to breathe. Defendant testified that Antonio appeared to be breathing fine and went to sleep. Defendant further testified that he went to bed around 3:00 a.m. When he woke up in the morning, he learned that his son had died. Defendant denied that he had intended to hurt or to harm Antonio, or that he knew his actions would harm Antonio.

After the close of the proofs, defense counsel requested that the jury be instructed on the offense of second-degree child abuse, arguing that the jury could find defendant's actions had only been reckless. The trial court denied the request, finding that, according to the pathologist's testimony, blunt force trauma caused Antonio's death, that defendant admitted intentionally striking the baby, and that therefore, defendant's act resulting in death was intentional. The trial court further concluded that, given these findings, there was no evidence that any reckless act by defendant resulted in serious injury to Antonio, and that, therefore, the jury should not be instructed on second-degree child abuse. The jury subsequently convicted defendant of felony murder and first-degree child abuse.

II

Defendant first argues that there was insufficient evidence to support his convictions, arguing that he struck Antonio but he did not intend to cause serious physical or mental harm to the baby. We disagree.

"A challenge to the sufficiency of the evidence in a jury trial is reviewed de novo, in the light most favorable to the prosecution, to determine whether the trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Gaines*, ___ Mich App ___; ___ NW2d ___ (2014), slip op at 3. Under MCL 750.136b(2), "[a] person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical or serious mental harm to a child."

> The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b) [including first-degree child abuse]. [*People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009).]

Although defendant claims that he only struck the baby when performing CPR and that he lacked the necessary intent to cause serious physical harm, a reasonable trier of fact could conclude that defendant knowingly or intentionally caused serious physical harm to Antonio. The record demonstrated that defendant was under stress, which he had demonstrated by recently threatening suicide, driving erratically with his children in the car, and expressing frustration when Antonio would not stop crying. On the morning of March 24, defendant was so angry that he punched holes in the walls of the family home, and when Lee left for work, Antonio was in defendant's sole care and custody. That evening, defendant played videogames at Parris's home for several hours without checking on Antonio, and when Lee arrived home around midnight, defendant instructed her to not wake the baby up. Defendant behaved uncharacteristically afterward—just sitting on the couch when he returned to Parris's house and pacing the couple's bedroom at 3:00 a.m. Lee found the baby cold and covered with bruises about seven hours later, but Officer Sexton observed that none of the bruises were in the area where defendant performed CPR on Antonio. Further, Dr. Bechinski opined that the baby's injuries were caused by squeezing, punching, shaking, or being struck against a wall, and that some of the injuries would have required the force comparable to a high-speed vehicle collision. And, Officer Sexton and a responding firefighter observed that Antonio's diaper was clean, not soiled as would be expected after death, consistent with expert testimony that the baby could have been dead up to 24 hours before arriving to the hospital.

From this plethora of evidence, the jury could properly infer that defendant knowingly or intentionally caused serious harm to Antonio when he was in defendant's sole care and custody on March 24. The fact that defendant claimed he merely struck the baby while performing CPR, and that this testimony conflicts with the other testimony in the case, does not render the evidence insufficient to convict defendant of felony murder and first-degree child abuse. Rather, we must resolve all conflicts in the evidence in favor of the prosecution and we will not interfere

with the jury's determinations regarding the weight of the evidence or the credibility of witnesses. *People v Stevens*, ___ Mich App ___; ___ NW2d ___ (2014), slip op at 4-5.

III

Defendant next argues that the trial court committed error requiring reversal when it refused to instruct the jury on second-degree child abuse. Although we agree that the trial court erred by refusing to provide the instruction, we conclude that the error does not require reversal.

We review de novo issues of law arising from jury instructions, but a trial court's determination whether an instruction is applicable to the facts of the case is reviewed for an abuse of discretion. *People v Gillis,* 474 Mich 105, 113; 712 NW2d 419 (2006). The trial court abuses its discretion when its decision is outside the range of principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

When issuing jury instructions, a trial court must instruct on all relevant issues, defenses, and theories if they are supported by the evidence. *People v McGhee*, 268 Mich App 600, 606; 709 NW2d 595 (2005).

Under the Code of Criminal Procedure, when a person is charged with an offense that consists of different degrees, the jury or judge in a trial without a jury may find the defendant guilty of a degree of that offense inferior to that charged in the indictment or information. MCL 768.32(1); *People v Smith*, 478 Mich 64, 69; 731 NW2d 411 (2007). Generally, a lesser offense is necessarily included when the elements of the lesser offense are subsumed within the elements of the greater offense. *People v Wilder*, 485 Mich 35, 41; 780 NW2d 265 (2010); *People v Mendoza*, 468 Mich 527, 540; 664 NW2d 685 (2003). A requested instruction on a necessarily included lesser offense should be given if the charged greater offense requires the jury to find a disputed factual element that is not part of the included lesser offense, and a rational view of the evidence would support it. *People v Cornell*, 466 Mich 335, 357; 646 NW2d 127 (2002).[3] If the trial court does not instruct the jury on a lesser included offense, this Court must review the error

---

[3] We note that many unpublished opinions of this Court cite *Cornell* as having been overruled in part by *People v Mendoza*, 468 Mich 527; 664 NW2d 685 (2003). See, e.g., *People v Giles*, unpublished opinion per curiam of the Court of Appeals issued December 17, 2013 (Docket No. 309338), p 6. We read nothing in *Mendoza* as overruling any part of *Cornell*. In fact, the *Cornell* decision was the cornerstone of the Court's analysis in *Mendoza*. Perhaps this citation confusion arose from a statement in *People v Dixon*, unpublished opinion per curiam of the Court of Appeals issued November 23, 2004 (Docket No. 249954), p 2, that *Mendoza* "overruled *Cornell* and [*People v*] *Van Wyck*, [402 Mich 266; 262 NW2d 638 (1978),] holding that when a defendant is charged with murder, an instruction for manslaughter must be given if supported by the evidence because manslaughter is a necessarily included lesser offense of murder." While *Mendoza*, 468 Mich at 543-544, overruled *Van Wyck*, it did so by citing and relying on *Cornell*. At any rate, our Supreme Court does not cite *Cornell* as being overruled even in part by *Mendoza*. See *Wilder*, 485 Mich at 41, n 12 & n 14; see also *People v Nyx*, 479 Mich 112, 114; 734 NW2d 548 (2 007).

for harmless error. *Id.* at 361-362, citing *People v Mosko*, 441 Mich 496, 503; 495 NW2d 534 (1992). To prove that the error is harmful rather than harmless, "a defendant must persuade the reviewing court that it is more probable than not that the error . . . was outcome determinative. An error is deemed 'outcome determinative' if it undermined the reliability of the verdict." *People v Rodriguez*, 463 Mich 466, 473-474; 620 NW2d 13 (2000) (quotation marks and citations omitted). "In other words, it is only when there is substantial evidence to support the requested instruction that an appellate court should reverse the conviction." *Cornell*, 466 Mich. at 365.[4] Substantial evidence exists when upon review of the ' "entire cause," ' we determine that the failure to provide the instruction resulted in a miscarriage of justice. *Id.*, quoting MCL 769.26.

A

Second-degree child abuse can be proved by showing a person acted knowingly and intentionally, or by showing that the person acted recklessly. We conclude that either theory of second-degree child abuse is a necessarily included lesser offense of first-degree child abuse, and that a rational view of the evidence in this case would have supported a jury instruction on second-degree child abuse.

MCL 750.136b(2) provides that "[a] person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical or serious mental harm to a child." In *People v Maynor*, 470 Mich 289, 291; 683 NW2d 565 (2004), our Supreme Court held that to be convicted of this offense the prosecution must prove and the jury must find "not only that [the] defendant intended to commit the act, but also that [the] defendant intended to cause serious physical harm or knew that serious physical harm would be caused by [his or] her act." Although the jury need not be instructed regarding "specific intent," it must be "instructed that it must find that defendant either knowingly or intentionally caused the harm." *Id.* at 296.

MCL 750.136b(3) provides that a person is guilty of second-degree child abuse when any of the following apply:

---

[4] In *People v Heft*, 299 Mich App 69, 73; 829 NW2d 266 (2012), this Court held that "[i]f the trial court [errs by failing to] instruct the jury on a lesser included offense, the error *requires* reversal if the evidence at trial *clearly supported* the instruction." (Emphasis added.) *Heft* follows *People v Silver*, 466 Mich 386, 388 n 2; 646 NW2d 150 (2001) (opinion by TAYLOR, J.), for this proposition. The *Silver*/*Heft* standard differs, however, from the standard articulated in *Cornell*, in that *Cornell* provides that reversal is warranted, not when there was *clearly* evidence in support of the instruction, but only when there is *substantial evidence* to support the instruction. *Silver* is a plurality opinion, and as such, it did not overrule or modify the rule of law set forth in *Cornell*. *Spectrum Health Hosps v Farm Bureau Mut Ins Co of Mich*, 492 Mich 503, 535; 821 NW2d 117 (2012) (holding that a plurality opinion is not authoritative beyond the immediate parties). Thus, because *Cornell* continues to be good and binding law, we decline to follow either *Silver* or *Heft*.

-6-

(a) The person's omission causes serious physical harm or serious mental harm to a child or if the person's reckless act causes serious physical harm or serious mental harm to a child.

(b) The person knowingly or intentionally commits an act likely to cause serious physical or mental harm to a child regardless of whether harm results.

(c) The person knowingly or intentionally commits an act that is cruel to a child regardless of whether harm results.[5]

The element distinguishing first-degree child abuse from second-degree child abuse in MCL 750.136b(3)(b) is harm. A person who knowingly or intentionally causes serious physical or serious mental harm to a child is guilty of first-degree child abuse whereas a person can be convicted of second-degree child abuse for an intentional act likely to cause serious harm, regardless of actual harm. MCL 750.136b(3)(b). In other words, this alternative version of second-degree child abuse is completely subsumed in first-degree child abuse.

In addition, the element distinguishing first-degree child abuse from second-degree child abuse resulting from a reckless act in MCL 750.136b(3)(a) is the offender's state of mind. Specifically, as the *Maynor* Court held, to be convicted of first-degree child abuse, the defendant must not only cause "serious physical or serious mental harm to a child" but must also either have acted intending to cause serious harm or knowing that his actions would cause serious harm. *Maynor*, 470 Mich at 291, 296. Absent proof of this necessary element of intent or knowledge, a person is guilty of second-degree child abuse where his or her reckless act causes serious physical harm or serious mental harm to a child. MCL 750.136b(3)(a).

Consequently, the variants of second-degree child abuse in MCL 750.136b(3)(b) (involving an intentional act which is likely to cause serious harm) and MCL 750.136b(3)(a) (involving a reckless act) are necessarily included offenses of first-degree child abuse. *Wilder*, 485 Mich at 41; *Mendoza*, 468 Mich at 540.

B

As we noted earlier, the trial court reasoned when it declined to grant defendant's request to instruct the jury regarding second-degree child abuse that it was undisputed that defendant acted intentionally and that defendant's intentional act resulted in Antonio's death. But defendant's statements to the police and his testimony at trial that the baby was fine after defendant rolled over him while they were sleeping, and after defendant had momentarily left the baby alone in the bath, were evidence that, if believed, could have supported a jury verdict finding defendant guilty of second-degree child abuse under MCL 750.136b(3)(b). Likewise, defendant's testimony that he struck Antonio while performing CPR to try to get him to breathe, if believed by the jury, could have supported a jury verdict finding defendant guilty of second-

---

[5] We list this form of second-degree child abuse only for completeness. Neither party asserts it applies to the facts of this case.

degree child abuse under MCL 750.136b(3)(a). Thus, the trial court erred by not instructing the jury on second-degree child abuse as requested by defendant.

C

Despite the trial court's error, however, reversal is not warranted. Defendant has not sustained his burden of demonstrating that, properly instructed, it was more probable than not that the jury would have convicted him of second-degree child abuse under MCL 750.136b(3)(b) rather than first-degree child abuse. None of defendant's inconsistent depictions of his care of Antonio before his death explain the injuries Antonio sustained. In particular, Dr. Bechinski opined Antonio's injuries were caused by squeezing, punching, shaking, or being struck against a wall, and that some of the injuries would have required the force comparable to a high-speed vehicle collision. In addition, contrary to defendant's testimony, the baby was *not* fine after being in defendant's care. Antonio's injuries after being in defendant's care were extensive, as he was covered with bruises and abrasions and had internal injuries described as "textbook" for battered children.

Similarly, defendant has not sustained his burden of demonstrating that it was more probable than not that the jury would have convicted him of second-degree child abuse under MCL 750.136b(3)(a) rather than first-degree child abuse. Despite defendant's testimony that he struck Antonio while performing CPR merely to try to get him to breathe, the evidence demonstrated the baby's injuries were inconsistent with improper CPR. Further, the jury was unlikely to believe defendant's inconsistent explanations for the baby's injuries in light of defendant's history of violence, the anger and violence he exhibited on the morning before he was entrusted to care for Antonio, and evidence that defendant grew frustrated when attempting to calm the baby who cried often.

A review of the entire cause does not show that defendant merely committed an act likely to cause serious harm, regardless of actual harm, or that defendant acted recklessly, not knowingly, in causing injury Antonio. As such, the trial court's failure to instruct the jury on the necessarily included lesser offense of second-degree child abuse did not undermine the reliability of the verdict, and that failure was harmless.

IV

For all of the foregoing reasons, we affirm.

/s/ Kurtis T. Wilder
/s/ E. Thomas Fitzgerald

-8-