# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MYRON TYRONE WILLIAMS,

Defendant-Appellant.

UNPUBLISHED
October 20, 2015

No. 321582
Wayne Circuit Court
LC No. 13-009253-FC

Before: BORRELLO, P.J., and JANSEN and OWENS, JJ.

PER CURIAM.

A jury convicted defendant of first-degree felony murder, MCL 750.316(1)(b), second-degree murder, MCL 750.317, and unarmed robbery, MCL 750.530. At sentencing, the trial court vacated the second-degree murder conviction and sentenced defendant to life in prison for the felony-murder conviction and a concurrent prison term of 8 years' and 4 months to 15 years' for the unarmed robbery conviction. Defendant appeals as of right. For the reasons set forth in this opinion, we affirm.

## I. FACTS

Defendant's convictions arise out of the May 15, 2013, murder of Sabrina Gianino. At the time, Gianino lived with her boyfriend Bruce Hunsinger in the lower unit of a two-family flat in Grosse Pointe Park. Defendant lived next door in his sister Tracy Davis' attic with his wife (Quashaunda Williams), his three children, and one step-child. Davis and Quashaunda testified that they moved into the attic to avoid homelessness when defendant used the family's rent money for drugs and they were evicted. Defendant had been unemployed after being fired from a truck driving job.

According to Quashaunda, defendant was addicted to crack cocaine before they were married 10 years ago. Davis recalled that when defendant lived in Louisiana he was known to steal items to exchange for crack cocaine. She also had jewelry that "came up missing" from her home, but both defendant and her son had access to the home. Davis' son, Cardell Williams, testified that defendant was addicted to crack cocaine.

On May 15, 2013, defendant came home between 9:30 and 10:00 p.m. When the children were asleep by around 9:30 or 9:45 p.m., Quashaunda dozed off with her headphones

-1-

on. Quashaunda recalled that, at that time, defendant was still fully clothed and sitting on their bed; she awoke at some point to go to the bathroom, but defendant was not there.

Hunsinger was working at Marge's Bar and Grill that night approximately one mile from Gianino's home, from 5:00 to 11:00 p.m. While working, Hunsinger called Gianino between 10:30 and 10:45 p.m. He did not notice anything unusual with her demeanor. He said he would be home late because work was busy and asked her to administer their cat's medicine.

The neighbor who lived in the cottage behind Gianino, Robert Patrick Toole, noticed that Gianino's back door was open all evening. He did not hear any screaming or noises that "sounded aggressive" between 10:30 and 11:30 p.m. However, Dawn Golden, who lived in the flat above Gianino heard the back door of the lower flat slam around 11:00 p.m.; she too did not hear any fighting or screaming.

According to Hunsinger's supervisor James Depuys and acquaintance Marsha Clark, Hunsinger left work around 11:15 or 11:20 p.m., and went to Detroit to buy marijuana from Clark—arriving around 11:35 or 11:40 p.m.—and then returned to the bar shortly before midnight. Hunsinger only stayed for 10 minutes and then went home.

Hunsinger arrived home at about 12:10 a.m., on May 16, 2013. He discovered Gianino lying face down on the floor of a bedroom where the couple stored cat supplies. Hunsinger spoke to Gianino and shook her shoulder, but she did not respond. Hunsinger called 911. During the conversation, Hunsinger noticed an electrical cord tied around Gianino's neck. When police arrived, Hunsinger searched the home for anything that was missing and could not find Gianino's purse or bag with identification, money, and cards, Hunsinger's laptop, Gianino's cellular phone, and an iPod. Although he did not notice it when the police were there, Hunsinger later realized some jewelry was also missing.

Antonio Mitchell (a.k.a "Montana"), and his roommate Dora Cunningham, testified that defendant, who they knew as "T.D.", bought crack cocaine from them every other day for several months. On May 15, 2013, between 11:00 p.m. and midnight, defendant knocked on the door of Mitchell's home on Alter Road and Mitchell let him inside. Mitchell testified that defendant seemed "pretty normal, but he was . . . a little loud." Defendant asked Mitchell if he wanted to buy a laptop. Initially, Mitchell was reluctant to purchase it because he does not know much about laptops, but he ultimately gave defendant $10 or $20 worth of crack cocaine for the machine. Mitchell identified it at trial as Hunsinger's laptop.

Mitchell ultimately asked defendant to leave because he was so loud. When defendant left, Mitchell noticed an iPod and cellular phone next to the laptop that he had not seen before; defendant had not mentioned these items to him. At trial, Mitchell identified these items among those that had been taken from Hunsinger's home.

Quashaunda was awakened later when she heard the front door close, defendant walk up the stairs, and heard him making a crying noise. Quashaunda asked where he had been and he replied that he was using the bathroom; she did not believe him because she had heard the front door and he generally relieved himself in a jug in the attic during the night. Quashaunda also

observed that defendant was "spaced out" and sweating, similar to past occasions when he smoked crack cocaine.

Later that night, police came to Davis' flat to inquire if she observed anything next door. When the police left, she yelled to defendant and Quashaunda to see if they were there; both responded affirmatively. She then woke her son up to see if he had heard anything, but he had not. Davis went out to the porch to see what was happening next door and Quashaunda joined her, but defendant stayed in bed.

Meanwhile, Mitchell gave the cellular phone to someone he identified as "Hustle Man." But several hours later, Hustle Man returned the phone and said, "[A] dead person on the phone." Mitchell did not understand and thought Hustle Man was joking or the phone was broken. Sergeant Joseph Srebernak had been calling Gianino's phone repeatedly after responding to the crime scene. About three hours after the scene was secure, Mitchell called him back using the phone. Sergeant Srebernak informed Mitchell that the phone had been involved in a serious crime and he wanted to talk to Mitchell about how he came into possession of it. Initially, Mitchell replied that he did not want to help, but later agreed to meet at a gas station within five minutes. Mitchell testified that he never went to the gas station because he was afraid he would be arrested for something he had no information about.

Mitchell stated that he then gave the phone to Gerald Miller who in turn gave it to his son Brandon Hines. Miller and Hines ultimately called a number identified as "Mom" in the phone's contact list to return the phone. Gianino's friend answered and scheduled a meeting at a Rite Aid with Hines and then notified police about the meeting. When no one came to Rite Aid within 30 minutes of the meeting time, Hines left for work. Officer Ryan Milroth subsequently pulled him over and arrested him; the victim's cellular phone was recovered from Hines.

When Miller and Mitchell inquired with an officer, who was towing Hines's vehicle, about Hines's arrest, Miller explained that he actually found the phone. Miller and Mitchell were then arrested. During an interview with police, Mitchell explained how he obtained the phone from defendant.

Dr. Francisco Diaz performed an autopsy and testified that Gianino died as the result of strangulation and blunt trauma—at least three distinct blows with a "roughly round" shape—to the head; the manner of death was homicide. On cross-examination, Dr. Diaz testified that it was unlikely but not impossible that the blows were caused by human hands or a metal hammer, and possible that they were caused by a rubber mallet. Gianino did not exhibit any defensive wounds and had alcohol and anxiety medication in her blood.

On May 18, 2013, defendant was arrested and he was carrying a wallet, which was placed in evidence at the police department. The police did not observe any defensive wounds on defendant. In an interview with police, defendant denied delivering any property to anyone. He also claimed that he did not know anyone on Alter Road, and he avoided that area because someone tried to rob him in that neighborhood. When police asked if defendant knew "Montana," defendant replied that he did not and then further explained that he bought his crack cocaine from someone in Detroit. He claimed that he had not smoked crack cocaine for about a

month and that he never smoked marijuana. He also denied ever being inside the victim's house, and stated, "I've never seen the woman."

While in jail, defendant wrote to Quashaunda, repeatedly asking her to retrieve his wallet from the police. After reading the letters, Detective Pittman obtained a search warrant for defendant's wallet at the Wayne County Jail. The wallet contained an Abercrombie and Fitch gift card. An Abercrombie and Fitch employee testified regarding the history of the gift card, including the purchase of a t-shirt with a moose on it from the Lakeside Mall in Sterling Heights, on August 30, 2010. The same kind of shirt was recovered from boxes of Gianino's clothing.

In May 2013, Marvin Mullen was jailed with defendant. Mullen recalled that defendant said his nephew spoke to the media about the allegations and he "wouldn't know if he did it or not." Mullen testified that defendant said he knew the victim and her husband, who was mean and usually came home from work at a "ball room or a bar" around 10:00 p.m. Mullen recalled that defendant said he had left the house that night to get a beer at the store and also that he found or took a laptop and a cellular phone, and then sold them. Finally, Mullen recalled that defendant did not know why the police suspected him of murder because he "hadn't did nothing." But when Mullen said the person who killed the victim was a "sick individual," defendant agreed and laughed.

In June 2013, Dominique Harris was jailed next to a person named "Myron," whom she spoke to through adjoining cells, but did not see until she was released. Myron told her that he lived on Wayburn and that he had been arrested for the murder of a white woman on that street; when she asked if he did it, defendant replied, "[I]f he did do it, [the police] wouldn't find any evidence, that he good at what he do." He never denied murdering the victim and said, "he wasn't going to tell me because . . . I might snitch on him." Defendant asked Harris three or four times to contact Quashaunda and tell her to get his wallet because there was something inside that he wanted her to retrieve.

In July 2013, Darius Johnson was jailed with defendant. He testified at trial that, when he was incarcerated, he spoke with an unidentified male inmate through the wall, who "sounded southern"[1] and said he lived on Wayburn, had a wife, three kids, and a stepchild, and wanted to talk to his sister. The inmate told Johnson about a murder that had been committed involving a rope and the theft of some personal items, including a laptop and a cellular phone. When discussing the murder, the inmate said, "I killed that bitch." Johnson glimpsed at the inmate when he changed cells; he was the same person that Johnson saw in court.

Defendant was convicted and sentenced as set forth above and this appeal ensued.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that there was insufficient evidence to support his convictions.

---

[1] During defendant's interview with police, the police noted that defendant has a southern accent and defendant explained that he is originally from Louisiana.

We review a challenge to the sufficiency of the evidence de novo by reviewing the evidence in the light most favorable to the prosecution to determine whether the trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt. *People v Harverson*, 291 Mich App 171, 175; 804 NW2d 757 (2010). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999).

The elements of felony murder include the following:

> (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b) [including robbery] [*People v Burks*, 308 Mich App 256, 264; 864 NW2d 580, 585 (2014) (quotation marks and citations omitted).]

"To be guilty of unarmed robbery, a defendant must (1) feloniously take the property of another, (2) by force or violence or assault or putting in fear, and (3) be unarmed." *Harverson*, 291 Mich App at 177.

The record indicates that there was a substantial amount of circumstantial evidence of defendant's guilt in this case. Specifically, evidence of defendant's drug addiction, his history of stealing to buy drugs, and his wife's explanation that he used any earnings on drugs would have allowed a rational jury to infer that defendant had a motive to steal from the victim to support his drug addiction. In addition, evidence showed that defendant knew that the victim's boyfriend Hunsinger typically arrived home late from work, neighbors could see that the victim's back door was open on the evening of the offense, and the victim was under the influence of alcohol and prescription medication, giving defendant an opportunity to steal from her and murder her to conceal his crime. This evidence combined to show that defendant had motive and opportunity to commit the crime. See *People v Unger*, 278 Mich App 210, 223-224; 749 NW2d 272 (2008) (evidence of motive and opportunity are logically relevant in a prosecution for murder).

Additionally, other evidence showed that defendant possessed property that was stolen from the victim on the night of the murder and that he used some of the property to support his drug addiction. Specifically, defendant left home near the time the victim was killed and the jury could infer from an inmate's testimony about statements defendant made while they were in jail together that defendant admitted to killing her. Defendant also sold Hunsinger's laptop to Mitchell in exchange for crack cocaine within approximately an hour of the offense and then left the victim's cellular phone and iPod on Mitchell's couch. In his wallet, defendant stored a gift card that the jury could infer belonged to the victim and was stolen from her during the robbery and murder. Furthermore, defendant exhibited consciousness of guilt when he repeatedly urged his wife to retrieve his wallet containing the stolen gift card from the police following his arrest. See *People v Kowalski*, 489 Mich 488, 509 n 37; 803 NW2d 200 (2011) ("attempts to conceal involvement in a crime are probative of a defendant's consciousness of guilt"). Finally, defendant made false statements about knowing the victim, his drug use and knowledge of Mitchell, and delivering the property stolen from the victim's flat, which the jury could infer was

an attempt to mislead or ward off suspicion and therefore strengthened other inferences of his guilt. *People v Seals*, 285 Mich App 1, 5-6; 776 NW2d 314 (2009).

Viewing all of this evidence in a light most favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that defendant was guilty of unarmed robbery and felony murder. *Harverson*, 291 Mich App at 175.

Although defendant asserts that the victim may have given him the property, nothing in the record supports this argument. Rather, a fellow jail inmate testified that defendant told him that he took the laptop and cellular phone, and the jury could infer that the items were taken by force from the fact that the victim was strangled and left on the floor of her flat from which the items disappeared. Defendant's theory regarding consent is also inconsistent with his statements to the police that he did not know the victim and had no connection to the missing property.

In addition, defendant claims there was insufficient evidence to prove that the victim's death occurred in the course of a robbery, but the jury could infer from the evidence that the victim's property was taken at the same time she was killed. Furthermore, the jury could infer from defendant's statements to various inmates that he killed the victim and stole her property. Defendant's history of stealing for drugs, and the fact that he immediately exchanged the laptop for cocaine supported that he killed the victim in the course of stealing the items to satisfy his addiction. Defendant's challenges to the credibility of the witnesses must fail because those determinations are within the exclusive province of the jury and will not be second-guessed by this Court on appeal. *People v Gadomski*, 232 Mich App 24, 28; 592 NW2d 75 (1998).

III. JURY VOIR DIRE

Next, defendant raises two issues related to the jury voir dire. First, defendant argues that the trial court asked superficial, leading questions during voir dire and did little to uncover potential biases. Second, defendant argues that the trial court abused its discretion by precluding defense counsel from asking questions.

We review preserved challenges concerning voir dire for an abuse of discretion. *People v Tyburski*, 445 Mich 606, 619; 518 NW2d 441 (1994). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Unger*, 278 Mich App at 217.

"A defendant who chooses a jury trial has an absolute right to a fair and impartial jury." *Tyburski*, 445 Mich at 618. "The purpose of voir dire is to elicit enough information for development of a rational basis for excluding those who are not impartial from the jury." *Id*. "Defendant does not have a right to have counsel conduct the voir dire, nor does he have a right to individual, sequestered voir dire. Neither does he have a right in every case to have the court ask questions submitted by counsel." *Id*. at 619. There are no "hard and fast rules" regarding what constitutes acceptable voir dire. *People v Sawyer*, 215 Mich App 183, 186; 545 NW2d 6 (1996). "Rather, trial courts must be allowed wide discretion in the manner they employ to achieve the goal of an impartial jury." *Id*. at 186-187 (quotation marks omitted). In reviewing the trial court's conduct, the test is whether the trial court conducted a voir dire "sufficiently probing . . . to uncover potential juror bias." *Tyburski*, 445 Mich at 609.

With respect to defendant's first argument, the record indicates that the trial court's questioning during voir dire was "sufficiently probing . . . to uncover potential juror bias." *Id*. Defendant argues that the trial court improperly "took at face value" the potential jurors' responses whether they could give equal weight to witnesses' testimony, even if a police officer testified. But defendant's argument is inconsistent with the record. The trial court not only asked whether the potential jurors could follow its instruction to evaluate the testimony of a police officer with the same standards of other witnesses, but also inquired about their relationships to the law enforcement community, any negative experiences with the police, and the arrest histories and criminal backgrounds of the potential jurors and their friends and family.

Defendant further argues that the trial court failed to probe potential jurors regarding their close association with members of the legal community. Defendant's argument is again inconsistent with the record. The trial court did not simply ask potential jurors regarding whether they had a relationship with someone in the legal community. Rather, if a relationship existed, the trial court probed further about the type of relationship, the area of law practiced, the frequency of contact the practitioner had with the potential jurors, any discussions the potential jurors had had with the practitioner about the law, the ability of the potential jurors to avoid contact with the practitioner during the trial, and the ability of the potential jurors to follow the court's instructions despite having learned something conflicting from any practitioners. The trial court also asked the potential jurors if they could be fair and impartial despite their relationships with members of the legal community.

Although defendant claims that the trial court's questions were general and leading, he does not articulate on appeal what additional probing questions the trial court should have asked, and how different questions would have helped the parties to determine which potential jurors were impartial. See e.g. *People Orlewicz*, 293 Mich App 96, 105; 809 NW2d 194 (2011), remanded on other grounds 493 Mich 916 (2012) (in rejecting the defendant's challenge to the trial court's voir dire, this Court noted that "[d]efendant fails to articulate what the trial court should have asked in addition to the questions it did ask. . . .") Furthermore, when potential jurors stated that their prior experiences or relationships might impair their abilities to decide the case fairly, the trial court excused those individuals with the approval of the parties. Defendant's complaint that the trial court merely asked questions requiring a "yes" or "no" answer is inconsistent with the record involving two days of voir dire wherein the trial court engaged in a thorough examination of the potential jurors using multiple different questioning techniques.

Defendant's second argument also fails. As noted, a defendant does not have the right to have his attorney conduct voir dire. *Tyburski*, 445 Mich at 619. However, in this case, the trial court allowed both the prosecution and defense counsel to submit questions for the court to ask potential jurors, but required that they be submitted at least a week before trial. Defense counsel did not submit questions because he feared the questions would prematurely reveal his theory of the case to the prosecutor. Because defense counsel prioritized the element of surprise over the trial court's voir dire deadline, it was not outside the range of principled outcomes for the trial court to preclude defense counsel's late request for questioning during voir dire. *Unger*, 278 Mich App at 217. Moreover, defendant does not articulate on appeal what additional probing questions the trial court should have asked, or how different questions would have helped the parties to determine which potential jurors were impartial. See *Orlewicz*, 293 Mich App at 105. Furthermore, when potential jurors stated that their prior experiences or relationships might

impair their abilities to decide the case fairly, the trial court either questioned the potential jurors further or excused those individuals with the approval of the parties. Defendant's contention that the trial court merely asked questions requiring a "yes" or "no" answer is inconsistent with the record involving two days of voir dire, during which the trial court adopted many questioning techniques. Counsel repeatedly exercised peremptory challenges and consulted defendant regarding those decisions. There is no evidence that any of the jurors were biased or that a more thorough voir dire would have revealed any bias. In short, the trial court did not abuse its discretion in conducting the voir dire. *Tyburski*, 445 Mich at 619.

## IV. PROSECUTORIAL MISCONDUCT

In a Standard 4 brief, defendant argues that many of the prosecutor's statements in her opening statement were not supported by the evidence and amounted to misconduct.

Defendant's unpreserved claim of prosecutorial misconduct error is reviewed for plain error affecting his substantial rights. *People v Abraham*, 256 Mich App 265, 274, 662 NW2d 836 (2003). We review a claim of prosecutorial misconduct to determine whether a defendant was denied a fair and impartial trial. *Id*. at 272. Prosecutors are given latitude with regard to their arguments. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). "They are free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Id*.

All of defendant's claims on appeal are inconsistent with the record. Specifically, the record evidence and reasonable inferences arising from that evidence supported the prosecutor's statements that defendant's living conditions were "far from ideal," that defendant had a number of jobs and "had a hard time keeping a job," that defendant was receiving unemployment insurance benefits, which "had been reduced, and that soon would be running out," that defendant "liked to drink, and he liked to smoke crack, and those things cost money," and that defendant would sometimes "find things in the trash that he would sell for money." All of these challenged statements, and the other assertions in the opening statement, were supported by evidence presented at trial, including defendant's own statements in an interview with police, and reasonable inferences arising from the evidence. *Bahoda*, 448 Mich at 282. None of the statements were improper and defense counsel was not ineffective for failing to object to the statements. See *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004) (counsel is not required to make a futile objection.)

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Lastly, in his Standard 4 brief, defendant argues that defense counsel was ineffective for failing to impeach Hunsinger's boss DePuys, Mitchell, and Quashaunda.

Because defendant did not raise his claim of ineffective assistance of counsel in a motion for a new trial or a *Ginther*[2] hearing, our review is limited to mistakes apparent on the record.

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

*People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). "To demonstrate ineffective assistance, defendant must show: (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that this performance so prejudiced him that he was deprived of a fair trial." *People v Gaines*, 306 Mich App 289, 300; 856 NW2d 222 (2014) (citations omitted). "To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Id*. (citations omitted). "Effective assistance of counsel is presumed, and defendant bears a heavy burden of proving otherwise." *Id*. "Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy." *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *Id*. 76-77.

Defendant's argument regarding defense counsel's alleged failure to impeach DePuys is inconsistent with the record. Defendant's theory of the case was that Hunsinger was the perpetrator. Defense counsel's first line of inquiry on cross-examination of DePuys, which defendant quotes in his Standard 4 brief, involved what he told the police regarding the timing of Hunsinger's whereabouts. Then, in closing argument, defense counsel relied upon the doubt he created, in part with the impeachment of DePuys's timeline, to argue that Hunsinger had the opportunity to commit the crime with 45 unaccounted-for minutes. Defendant fails to explain what more defense counsel should have asked and has failed to show that counsel's cross-examination fell below an objective standard of reasonableness. *Gaines*, 306 Mich App at 300.

Defendant's argument regarding defense counsel's alleged failure to impeach Mitchell is also inconsistent with the record. A review of counsel's cross-examination of Mitchell indicates that counsel challenged Mitchell's recollection of events and his credibility and her performance did not fall below an objective standard of reasonableness. Specifically, on direct examination, Mitchell testified that defendant came to sell the laptop between 11:00 p.m. and midnight on the night of the offense, but on cross-examination defense counsel questioned Mitchell whether he remembered testifying at the preliminary examination that defendant actually visited between 10:00 p.m. and midnight. Mitchell testified that he did not remember that testimony, but later agreed that defendant was there during that broader time span. Likewise, although Mitchell testified on direct that defendant visited on the night of the offense, on cross-examination, Mitchell agreed that he was confused about the date of defendant's visit and defense counsel asked whether Mitchell remembered testifying that his memory was impaired because he "was getting high on the supply." In his Standard 4 brief, defendant cites all of defense counsel's efforts to impeach Mitchell, but does not argue that counsel should have asked anything more and he fails to show that counsel's performance was deficient. *Id*.

Finally, defendant's argument regarding defense counsel's alleged failure to impeach Quashaunda is again inconsistent with the record. On direct examination, Quashaunda testified that defendant arrived home sometime after she started putting their children to bed. She also testified that she could not be certain of defendant's whereabouts from 10:00 p.m. to midnight, because she slept during this period. Defense counsel elicited from Quashaunda that, during the investigative subpoena, she had previously testified that defendant was home between 10:00 p.m. and midnight, and according to a Facebook post, she was awake. In his Standard 4 brief, defendant cites these efforts to impeach Quashaunda, but does not argue that defense counsel

should have asked anything more. Therefore, he again fails to establish that defense counsel's representation fell below an objective standard of reasonableness.

In short, defendant has failed to show that counsel's performance in cross-examining the witnesses fell below an objective standard of reasonableness and he was not denied the effective assistance of counsel as guaranteed by the Sixth Amendment. *Gaines*, 306 Mich App at 300.

Affirmed.


/s/ Stephen L. Borrello
/s/ Kathleen Jansen
/s/ Donald S. Owens