# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JEREMY DEWAYNE BROWN,

        Defendant-Appellant.

UNPUBLISHED
January 12, 2016

No.   314341
Wayne Circuit Court
LC No.   12-005176-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

BRANDON LEWIS CAIN,

        Defendant-Appellant.

No.   314342
Wayne Circuit Court
LC No.   12-005176-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

REGINALD VAUGHN BROWN,

        Defendant-Appellant.

No.   314712
Wayne Circuit Court
LC No.   12-005176-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

BRIAN CHRISTOPHER LEE,

        Defendant-Appellant.

No.   316110
Wayne Circuit Court
LC No.   12-005176-FC

-1-

Before: TALBOT, C.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

Defendants Jeremy Dewayne Brown (J. Brown), Brandon Lewis Cain, Reginald Vaughn Brown (R. Brown), and Brian Christopher Lee were tried jointly, before two separate juries. One jury convicted J. Brown of two counts of first-degree premeditated murder, MCL 750.316(1)(a), two counts of first-degree felony murder, MCL 750.316(1)(b), and two counts of torture, MCL 750.85, and it convicted defendant R. Brown of two counts of first-degree premeditated murder, two counts of first-degree felony murder, two counts of torture, two counts of unlawful imprisonment, MCL 750.349b, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Another jury convicted Cain of two counts of first-degree premeditated murder, two counts of first-degree felony murder, two counts of torture, two counts of unlawful imprisonment, felon in possession of a firearm, MCL 750.224f, and felony-firearm, and it convicted Lee of four counts of second-degree murder. MCL 750.317.

The trial court sentenced J. Brown to life in prison for each murder conviction and 20 to 50 years in prison for each torture conviction, to be served concurrently. The court sentenced R. Brown to life in prison for each murder conviction, 20 to 50 years in prison for each torture conviction, and 35 months to 15 years in prison for each unlawful imprisonment conviction, to be served concurrently, but consecutive to a two-year term of imprisonment for the felony-firearm conviction. It sentenced Cain to life in prison for each murder conviction, 20 to 50 years in prison for each torture conviction, 3 to 15 years in prison for each unlawful imprisonment conviction, and one to five years for the felon-in-possession conviction, to be served concurrently, but consecutive to a two-year term of imprisonment for the felony-firearm conviction. Lastly, the court sentenced Lee to 45 to 80 years in prison for each second-degree murder conviction, to be served concurrently. All four defendants appeal as of right, and their appeals have been consolidated. We remand for correction of the judgments of sentence to vacate defendants' duplicative murder convictions and sentences, and remand for a *Crosby*[1] hearing with respect to Lee's departure sentences, but affirm defendants' convictions and sentences in all other respects.

Defendants' convictions arise from the abduction, torture, and murder of best friends, 18-year-old Abreeya Brown (Brown) and 21-year-old Ashley Conaway, after they refused to discontinue the prosecution of defendants Cain and Lee for a separate shooting incident weeks earlier.[2] Brown and Conaway were abducted on the evening of February 28, 2012. They were placed in the trunk of a vehicle and, for a short while, were able to use their cell phones to

---

[1] *United States v Crosby*, 397 F3d 103 (CA 2, 2005).

[2] Cain and Lee were each convicted of two counts of assault with intent to commit murder, MCL 750.83, and Lee was also convicted of felony-firearm, in connection with the earlier shooting incident. This Court affirmed those convictions in *People v Lee* and *People v Cain*, unpublished opinion per curiam of the Court of Appeals, issued April 21, 2015 (Docket Nos. 313302 & 313303), lv den ___ Mich ___ (9/29/2015) (Docket Nos. 151647 & 151774).

-2-

communicate with friends and family members from their location in the trunk, but they were not seen or heard from afterward. On March 24, 2012, the police found the victims' bodies buried in shallow graves in Eliza Howell Park. Autopsies revealed that each victim had been shot in the head at close range.[3]

## I. DOCKET NO. 314341 – J. BROWN'S APPEAL

### A. SUFFICIENCY OF THE EVIDENCE

J. Brown argues that there was insufficient evidence to support his convictions, arguing instead that the evidence only showed that he was an accessory after the fact. We disagree.

A challenge to the sufficiency of the evidence in a jury trial is reviewed de novo, by reviewing the evidence in the light most favorable to the prosecution to determine whether the trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt. *People v Harverson*, 291 Mich App 171, 175; 804 NW2d 757 (2010). "All conflicts with regard to the evidence must be resolved in favor of the prosecution." *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005).

An accessory after the fact is a substantive offense. *People v Perry*, 460 Mich 55, 62; 594 NW2d 477 (1999); *People v Lucas*, 402 Mich 302, 304-305; 262 NW2d 662 (1978). "An 'accessory after the fact' . . . is 'one who, with knowledge of the other's guilt, renders assistance to a felon in the effort to hinder his detection, arrest, trial or punishment.' " *Id*., 402 Mich at 304 (citation omitted). In contrast, the elements necessary to convict a defendant under an aiding and abetting theory are:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Plunkett*, 485 Mich 50, 61; 780 NW2d 280 (2010) (citations and quotation marks omitted).]

"[A] defendant who has helped both before and after a crime is [guilty] as a principal." *People v Hartford*, 159 Mich App 295, 301; 406 NW2d 276 (1987).

"The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). Premeditation means "to think about beforehand," and deliberation means "to measure and evaluate the major facets of a choice or problem." *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998) (citation and quotation omitted). Premeditation and deliberation

---

[3] Another codefendant, Miguel Rodriguez, was also charged in this case, but as discussed further below, he pleaded guilty to two counts of second-degree murder and was sentenced to 20 to 35 years in prison. His convictions and sentences are not at issue on appeal.

"may be inferred from the circumstances surrounding the killing." *People v Anderson*, 209 Mich App 527, 537; 531 NW2d 780 (1995). "Premeditation may be established through evidence of (1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the homicide." *People v Unger*, 278 Mich App 210, 229; 749 NW2d 272 (2008).

In *People v Burks*, 308 Mich App 256, 264; 864 NW2d 580 (2014), this Court, quoting *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009), observed:

> The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b) [including torture].

MCL 750.85 provides:

> A person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control commits torture and is guilty of a felony punishable by imprisonment for life or any term of years.

Contrary to J. Brown's argument that he was only an accessory after the fact, there was sufficient evidence for a reasonable trier of fact to conclude that he was an aider or abettor, if not a principal—helping before, during, and after the crimes. From the exchange of text messages, between R. Brown and J. Brown on the day before the victims' kidnapping, the jury could infer that J. Brown was anticipating a windfall, which required planning and his assistance to acquire a gun and a car. The jury could also infer, from J. Brown's actions, that the windfall involved defendants' plan to torture and kill Conaway and Brown. As discussed further below, the record demonstrated that J. Brown's phone number was ***-***-9038, and his phone was used near the scene of the kidnapping—a place it had never been used previously—immediately before the kidnapping. As the prosecutor argued, the jury could therefore infer that, from his presence, J. Brown aided the kidnapping by serving as a lookout. Furthermore, the women were buried in Eliza Howell Park. Given that J. Brown's phone was used near the park just hours before the crime, the prosecutor argued that the jury could infer that J. Brown was "scouting out" that burial location ahead of time. In addition to serving as a scout and a lookout, however, the jury could also infer that J. Brown offered aid and encouragement to defendants by meeting R. Brown after the shooting and burial, assisting with cleaning the weapon, setting fire to the silver Chrysler Sebring, which was used to transport the victims in the trunk, and providing a getaway to R. Brown as emergency personnel responded to the fire. Finally, from text messages involving R. Brown, the jury could infer that J. Brown's motive with these crimes was the $10,000 that R. Brown was splitting with "J." See *People v Henderson*, 306 Mich App 1, 11; 854 NW2d 234 (2014).

J. Brown claims on appeal that there is no evidence that he was the person using the phone at the scenes of the abduction and burial. Again, as discussed further below, it was

-4-

reasonable for the jury to infer that J. Brown was the person using that phone given who he was communicating with—his acquaintances and relatives (including his cousins, R. Brown and Miguel Rodriguez)—and witness testimony confirming that J. Brown was, in fact, in the places where and when the cell phone records show his phone was being used. In any event, weighing the evidence, drawing reasonable inferences from the evidence, and making credibility determinations are tasks within the exclusive province of the jury and will not be second-guessed by this Court. *Unger*, 278 Mich App at 232; *People v Gadomski*, 232 Mich App 24, 28; 592 NW2d 75 (1998). The evidence was sufficient to establish J. Brown's guilt of the charged crimes.

## B. JUDICIAL BIAS (VOIR DIRE)

During voir dire for the R. Brown/J. Brown jury, a prospective juror asked to be excused the following day for a Muslim holiday (Eid-al-Adha). Initially, the trial court excused members of the jury pool celebrating the holiday. Only after some of the prospective jurors began to leave did the trial court ask the parties if they had any objection. The prosecutor did not object. The following exchange then occurred on the record:

> *J. Brown's Attorney:* Judge, I respect everybody's religion. But I have some concerns, in terms of - -

> *Trial court:* Okay. Then- - then I can't excuse you. I'm sorry.

> *J. Brown's Attorney:* Well, but, Judge, I don't want to be looking like- -

> *Trial court:* Well, sir, you can't have it both ways.

> I'm sorry. I can't excuse you. No, no, no, I'm not excusing them. Get everybody back in. I'm not excusing those ladies either. See if we can catch them. Have everybody come in.

> *Deputy:* All right. Everybody have a seat, again.

> *Trial court:* Just everybody come on in. Everybody come back in. The two that we excused for the holiday, we're going to bring them back in. We'll just notify the jury pool to bring them back in. I'm going to cancel their holiday.

A defendant has the right to a fair and impartial trial under both the United States and Michigan Constitutions. See US Const, Am VI; Const 1963, art 1, § 20. This right is violated when the trial court's conduct "pierces the veil of judicial impartiality." *People v Conley*, 270 Mich App 301, 307-308; 715 NW2d 377 (2006). Although "a trial judge has wide discretion and power in matters of trial conduct," a trial court pierces the veil of judicial impartiality when its conduct or comments are "of such a nature as to unduly influence the jury and thereby deprive the appellant of his right to a fair and impartial trial." *People v Jackson*, 292 Mich App 583, 598; 808 NW2d 541 (2011) (citations and quotation marks omitted).

"A defendant claiming judicial bias must overcome a heavy presumption of judicial impartiality." *Id*. (citation and quotation marks omitted). A judge's opinions or judicial rulings

are not valid grounds for alleging bias "unless there is a deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible." *Id*., quoting *People v Wells*, 238 Mich App 383, 391; 605 NW2d 374 (1999) (quotation marks omitted); see also *Armstrong v Twp of Ypsilanti*, 248 Mich App 573, 596; 640 NW2d 321 (2001). In addition, "[c]omments that are critical of or hostile to counsel and the parties are generally not sufficient to pierce the veil of impartiality." *Jackson*, 292 Mich App at 598.

A trial court should, to the extent practical, make its rulings outside the presence of the jury. MRE 103(c). But here, the trial court had already made a ruling excusing the prospective jurors and defense counsel did not object until some had already left. It is unclear from the record how many, if any, prospective jurors heard counsel's objection first-hand. In any event, the trial court logically explained defense counsel's objection to the prospective jurors when she called them all back to the courtroom and changed her ruling. Nothing in the trial court's ruling evidences deep-seated favoritism or antagonism toward either defense counsel or J. Brown. Cf. *Wells*, 238 Mich App at 391 (even calling a defendant's attorney a liar, while punishing the attorney, did not indicate a bias or prejudice against the defendant). Rather, the trial court merely chronicled what had happened as a means of explanation. Therefore, J. Brown cannot overcome the heavy presumption of judicial impartiality. See *Jackson*, 292 Mich App at 598.

Even if we were to conclude that the trial court's statement amounted to error, it was harmless beyond a reasonable doubt. See *People v Anderson*, 446 Mich 392, 405; 521 NW2d 538 (1994). Before and after the evidence was presented, the trial court instructed the jury to ignore any opinions it believed the trial court possessed about the case, and to "set aside any bias or prejudice." "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). In addition, defense counsel had an opportunity to explain his objection on the record, in the presence of all the prospective jurors that heard the trial court's statement. As a result, the jury learned that his objection was not made out of disrespect for anyone's religious beliefs, but instead was intended to ensure that defendants had a jury that was representative of the cross-section of the local community, including Muslim citizens. Nothing in the record demonstrates that J. Brown suffered any prejudice from counsel's objection or the trial court's comments. On the contrary, even one prospective juror, who was initially upset that she could not celebrate the holiday, testified that she could be fair and would not hold grudges against defendants for this situation. Again, J. Brown cannot overcome the heavy presumption of judicial impartiality and even if the trial court erred, any error was harmless beyond a reasonable doubt.

## C. CELL PHONE RECORDS

Next, J. Brown argues that the trial court erred by admitting cell phone records without an adequate foundation. We disagree.

This Court reviews a trial court's decision regarding the admission of evidence for an abuse of discretion. *Unger*, 278 Mich App at 216. An abuse of discretion occurs when a trial court "chooses an outcome that is outside the range of reasonable and principled outcomes." *People v Waclawski*, 286 Mich App 634, 670; 780 NW2d 321 (2009).

"The rule governing the admission of physical evidence requires that a proper foundation be laid and that the articles be identified as that which they purport to be and that the articles are shown to be connected with the crime or with the accused." *People v Furman*, 158 Mich App 302, 331; 404 NW2d 246 (1987). MRE 901(a) provides that for a document to be admissible, it must be authenticated by the introduction of "evidence sufficient to support a finding that the matter in question is what its proponent claims." MRE 901(b) delineates, "[b]y way of illustration only, and not by way of limitation," various means or methods of authentication or identification to comply with "the requirements of this rule." MRE 901(b)(1) permits authentication through the elicitation of testimony from a "witness with knowledge . . . that a matter is what it is claimed to be." MRE 901(b)(4) also permits authentication by "distinctive characteristics," meaning "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." MRE 901(b)(6) permits identification of a telephone conversation with "evidence that a call was made to the number assigned at the time . . . to a particular person . . . if . . . circumstances, including self-identification, show the person answering to be the one called . . . ." Identification need not be "absolute or certain." *People v O'Brien*, 113 Mich App 183, 204; 317 NW2d 570 (1982).[4] "Once a proper foundation has been established, any deficiencies in the chain of custody go to the weight afforded to the evidence, rather than its admissibility." *People v White*, 208 Mich App 126, 133; 527 NW2d 34 (1994).

Jasmine Richbow testified that she called J. Brown for her fiancé, Raymon Brown, approximately four times during the same week of the kidnapping, or the month before. She further testified that she recalled J. Brown's cell phone number was \*\*\*-\*\*\*-9038. Text messages sent before the kidnapping also linked J. Brown to this Metro PCS phone number—identifying the sender "Jeremy," with J. Brown's address and birthday.

In addition, United States Marshall John Jaehnig, who compiled the cell phone records and testified about the phones' usage at trial, testified that some cellular providers, including Metro PCS, do not verify the name of the subscriber. Even though Metro PCS had no record of J. Brown's legal name associated with \*\*\*-\*\*\*-9038, the subscriber's name was "Ju Ju." At trial, the prosecution played a jail call involving an inmate, who used J. Brown's pin number. During the call, the inmate was called "Ju Ju" by the woman on the other end of the line. From these facts, the jury could infer that J. Brown's nickname was Ju Ju, and he used it to subscribe for the phone.

J. Brown argues that even if \*\*\*-\*\*\*-9038 was his phone number, the prosecutor failed to offer evidence identifying him as the person who used the phone at the time of the charged crimes. Again, under MRE 901(b), one way to authenticate a phone record is to show a call was made to the number assigned to a particular person at the time and circumstances establishing the person who answered was the one called. Jaehnig's testimony regarding the towers utilized by \*\*\*-\*\*\*-9038 around the time of the crimes allowed the jury to infer that it was J. Brown making and receiving calls and texts. Most importantly, \*\*\*-\*\*\*-9038 was utilized in the Eliza

---

[4] See MCR 7.215(J)(1).

Howell Park area from about 1:00 to 2:00 a.m. Richbow confirmed that J. Brown, in fact, was with her in that same area during that time period. That the tower usage showed that the phone returned to J. Brown's neighborhood on Beresford—both between the abduction and after J. Brown's visit to Richbow and the fire—and that the number was used to call J. Brown's friends and relatives, also allowed the jury to infer that it was J. Brown making and receiving calls and texts. Again, the foundation need not have identified J. Brown as the user with absolute certainty. See *O'Brien*, 113 Mich App at 204. Therefore, the trial court did not abuse its discretion by concluding that the prosecutor introduced evidence to establish a proper foundation for the admission of cell phone records for ***-***-9038.

## II. DOCKET NO. 314342 – CAIN'S APPEAL

### A. EFFECTIVE ASSISTANCE OF COUNSEL – CELL PHONE RECORDS EXPERT

Cain also complains about the admission of the cell phone records by arguing that defense counsel was ineffective for failing to call an expert to refute Jaehnig's testimony. We disagree. Because Cain did not raise this issue in an appropriate motion in the trial court and this Court denied his motion to remand, our review is limited to errors apparent from the record. See *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004); *People v Wilson*, 242 Mich App 350, 352; 619 NW2d 413 (2000).

The United States and Michigan Constitutions guarantee a defendant the right to the effective assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20. To establish ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceedings would have been different. *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 US at 694.

Effective assistance of counsel is presumed, and the defendant bears a substantial burden of proving otherwise. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012). A defendant can overcome the presumption by showing that counsel failed to perform an essential duty and that failure was prejudicial to the defendant. *People v Reinhardt*, 167 Mich App 584, 591; 423 NW2d 275 (1988), remanded on other grounds 436 Mich 866 (1990). Counsel's strategic judgments are afforded deference, *Wiggins v Smith*, 539 US 510, 521-522, 528; 123 S Ct 2527; 156 L Ed 2d 471 (2003), but strategic choices made after an incomplete investigation are reasonable only to the extent that reasonable professional judgments support the limitation on investigation. *Id.* at 521-522; *Trakhtenberg*, 493 Mich at 52-55.

The failure to reasonably investigate a case can constitute ineffective assistance of counsel. *Trakhtenberg*, 493 Mich at 51-55. However, defense counsel has extensive discretion on matters of trial strategy. *People v Heft*, 299 Mich App 69, 83; 829 NW2d 266 (2012). Decisions regarding whether to retain witnesses, including expert witnesses, are matters of trial strategy. *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003). "[A]n attorney's selection of an expert witness may be a 'paradigmatic example' of trial strategy, [but] that is so

only when it is made '*after* thorough investigation of [the] law and facts' in a case." *People v Ackley*, 497 Mich 381, 390; 870 NW2d 858 (2015), quoting *Hinton v Alabama*, ___ US ___, 134 S Ct 1081, 1088; 188 L Ed 2d 1 (2014) (emphasis in *Ackley*). "[T]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). A substantial defense is one that might have made a difference in the outcome of the trial. *People v Marshall*, 298 Mich App 607, 612; 830 NW2d 414 (2012), vacated in part on other grounds 493 Mich 1020 (2013).

Cain cannot establish that counsel's failure to call an expert regarding the cell phone records was anything but strategic. Nothing in the record establishes that counsel failed to consult with an expert, or made his decision not to retain an expert before deciding on a trial strategy. Instead, the record demonstrates that although counsel did not call an expert to testify, he cross-examined Jaehnig about the fact that he was not qualified as an expert and attempted to impeach the cell phone records by eliciting that (1) none of the phone records actually had a subscriber name of "Brandon Cain" or established that he was the subscriber with, for example, a handwriting sample of the subscriber, (2) Jaehnig did not research records for a number Cain acknowledged as his own, (3) the motive for Cain's involvement in the crimes was to silence the victims, who intended to prosecute him for an earlier February 8, 2012 shooting, and Cain first allegedly tried to buy their silence, but there was no evidence of any communication in the cell phone records for the victims and Cain around the time of the earlier shooting, and (4) Jaehnig had no evidence that Cain was actually the person using the phone numbers associated with him at any time. In addition, counsel used closing argument to discredit Jaehnig, arguing that he worked for the government, so his research would have a government-bias and his data were so "mangled and confusing" that it was unbelievable. Counsel reminded the jury in closing that there was no proof that Cain was actually using the phone. Again, there is no evidence that counsel made these strategic decisions about cross-examination and closing argument without first investigating whether to call his own cell phone records expert and declining to do so.

Additionally, Cain cannot establish a reasonable probability that calling an expert would have made a difference in the result of the proceedings. See *Trakhtenberg*, 493 Mich at 51. As Cain explains in his brief, no expert has reviewed the records or offered any proposed testimony contrary to that provided by Jaehnig.[5] Moreover, there was overwhelming evidence of Cain's guilt even without the cell phone records. Again, Cain had a motive to silence the victims. Brown's stepfather, Major Chapman, testified that while Brown was dragged to the trunk of a

---

[5] Although Cain states in his question presented that Jaehnig's testimony was not based on scientific analysis and did not meet the reliability standard in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579, 590; 113 S Ct 2786; 125 L Ed 2d 469 (1993), the *Daubert* standard applies to expert testimony and Jaehnig did not testify as an expert. Aside from merely citing a law review article that discusses cell phone records and *Daubert*, Cain makes no argument in his brief regarding why the *Daubert* standard should nevertheless apply. Therefore, Cain has abandoned this argument. See *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001) (holding that failure to brief a question on appeal is tantamount to abandoning it).

car, Cain fired shots at their home. In addition, the jury could infer that Cain sought out money from Andre Douglas on the night of the kidnapping to pay his accomplices for the kidnapping and murders. Eyewitness testimony placed Cain at Eliza Howell Park and the jury could infer that, around the same time, the victims were buried in the park. Finally, the jury could find that Cain was conscious of his guilt on the night of the kidnapping when he told one of his girlfriends, Audrey Christina Glenn, that she would no longer have to worry about Conaway competing for his affections. Given the presumption that counsel acted strategically and the absence of evidence establishing prejudice, Cain was not denied the effective assistance of counsel.

## B. SEVERANCE

Next, Cain argues that the trial court should have granted his motion to have a separate jury from Lee, or a separate trial. We disagree. "This Court reviews a trial court's decision regarding severing the trials of multiple defendants for an abuse of discretion." *People v Bosca*, 310 Mich App 1, 51; 871 NW2d 307 (2015); see also MCL 768.5.

"There is a strong policy favoring joint trials in the interest of justice, judicial economy, and administration, and a defendant does not have an absolute right to a separate trial." *People v Etheridge*, 196 Mich App 43, 52; 492 NW2d 490 (1992). A trial court must sever the trial of codefendants on related offenses only when the defendant shows that "severance is necessary to avoid prejudice to substantial rights of the defendant." MCR 6.121(C); *Etheridge*, 196 Mich App at 53. Under MCR 6.121(D), a trial court has the discretion to grant a request for severance "on the ground that severance is appropriate to promote fairness to the parties and a fair determination of the guilt or innocence of one or more of the defendants." When determining if severance is appropriate, a trial court may consider factors like "the potential for confusion or prejudice stemming from either the number of defendants or the complexity or nature of the evidence" and "the convenience of witnesses." MCR 6.121(D).

To show that severance is necessary, a defendant must provide the court with a supporting affidavit, or make an offer of proof, "that clearly, affirmatively, and fully demonstrates that his substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice." *People v Hana*, 447 Mich 325, 346; 524 NW2d 682 (1994); see also MCR 6.121(C). Such a showing is not made by codefendants' plans to present inconsistent defenses. *Hana*, 447 Mich at 349. The Supreme Court in *Hana* further explained:

> It is natural that defendants accused of the same crime and tried together will attempt to escape conviction by pointing the finger at each other. Whenever this occurs the co-defendants are, to some extent, forced to defend against their co-defendant as well as the government. This situation results in the sort of compelling prejudice requiring reversal, however, only when the competing defenses are so antagonistic at their cores that both cannot be believed. Consequently, we hold that a defendant seeking severance based on antagonistic defenses must demonstrate that his or her defense is so antagonistic to the co-defendants that the defenses are mutually exclusive. Moreover, defenses are mutually exclusive within the meaning of this rule if the jury, in order to believe the core of the evidence offered on behalf of one defendant, must disbelieve the

core of the evidence offered on behalf of the co-defendant. [*Id.* at 349-350, quoting *State v Kinkade*, 140 Ariz 91, 93; 680 P2d 801 (1984).]

During the pretrial motion hearing for severance, Cain's attorney referenced the fact that Cain and Lee received separate juries in their trial for the February 8 shooting incident. But he only argued that defendants had similarly antagonistic defenses in this case, without providing any explanation of those defenses. Therefore, Cain failed to clearly, affirmatively, and fully demonstrate how his substantial rights would be prejudiced if Cain and Lee shared a jury for this trial. See *id.* at 346-347.

Furthermore, nothing in the record demonstrates the prejudice required by MCR 6.121(C). Both Cain and Lee argued that they were not the perpetrators, but instead were merely present in the neighborhoods where some of the crimes occurred. They also denied having any motive for the kidnapping and murders—Cain arguing he did not order the February 8 shooting, and Cain and Lee both arguing that others besides Lee, such as Glen Hunter, Marlin Church, or Andre Douglas, actually fired the gun. In addition, both Cain and Lee argued that the prosecutor promised to produce Rodriguez to tie them to the crimes, but failed to fulfill that promise. Finally, Cain placed some of the blame on the victims themselves, arguing that they participated in high risk activities, such as visiting strip clubs and threatening rivals, and attempted to refute the prosecutor's claim that he had a serious relationship with Conaway, whom he sought to control through violence.

On appeal, Cain now argues that if the motion for severance had been granted, he would have argued that Lee, alone, had a motive to commit the crimes to silence the victims. But nothing in the record actually demonstrates such finger pointing. In addition, Cain's finger pointing regarding motive would not have been so antagonistic with Lee's defense that the defenses would have been mutually exclusive. Specifically, motive is not an element of the charged crimes. See *People v Fisher*, 193 Mich App 284, 289; 483 NW2d 452 (1992). The jury could have believed Cain's defense that, despite this motive, Lee had a motive to silence the victims, but at the same time believed Lee's defense that he was merely present in the neighborhood at the time of the crimes and played no part in them. The trial court did not abuse its discretion by denying the motion to sever.

## C. RODRIGUEZ

Cain's next claims involve his former codefendant, Rodriguez, who was also charged with the murders, torture, and unlawful imprisonment of the victims, and had been scheduled to be tried jointly with defendants. After the Cain/Lee jury was empaneled, Rodriguez pleaded guilty to two counts of second-degree murder and agreed to testify truthfully on behalf of the prosecution. Before continuing with opening statements, however, the trial court questioned the Cain/Lee jury about Rodriguez's role in the proceedings and all of the jurors agreed that they could keep an open mind and cautiously evaluate Rodriguez's credibility. The trial court then denied defendants' request to question the jurors and their motions for a mistrial.

Toward the end of trial, however, the prosecutor interviewed Rodriguez and informed the trial court that she suspected that he intended to perjure himself because his plea allocution differed from his interview statements regarding whether he knew the victims were in the trunk

and whether he saw Lee walking toward Eliza Howell Park with a victim. The prosecutor urged the trial court to treat Rodriguez as an unavailable witness, reasoning that she could not call a witness to testify who she knew intended to perjure himself. She noted, however, that the prosecution had not yet decided whether to withdraw Rodriguez's plea because of his failure to fulfill the obligation to testify truthfully.

The trial court ruled that good cause had been shown to treat Rodriguez as an unavailable witness and denied defendants' motions for a mistrial. R. Brown's attorney also later noted on the record that, even though the prosecutor declined to call Rodriguez to testify, his client wanted to call him. But then Rodriguez asserted his Fifth Amendment privilege and the trial court ruled that no one could call Rodriguez as a witness.

1. VOIR DIRE

First, Cain claims that the trial court abused its discretion in conducting voir dire about Rodriguez and by failing to allow defense counsel to question the jurors. We disagree. This Court reviews preserved challenges concerning voir dire for an abuse of discretion. MCR 6.412(C)(1); *People v Tyburski*, 445 Mich 606, 619; 518 NW2d 441 (1994).

"A defendant who chooses a jury trial has an absolute right to a fair and impartial jury." *Id*. at 618. "The purpose of voir dire is to elicit enough information for development of a rational basis for excluding those who are not impartial from the jury." *Id*. There are no "hard and fast rules" regarding what constitutes acceptable voir dire. *People v Sawyer*, 215 Mich App 183, 186; 545 NW2d 6 (1996). "Rather, trial courts must be allowed wide discretion in the manner they employ to achieve the goal of an impartial jury." *Id*. at 186-187 (quotation marks omitted). In reviewing the trial court's conduct, the test is whether the trial court conducted a voir dire "sufficiently probing . . . to uncover potential juror bias." *Tyburski*, 445 Mich at 609. "A defendant is entitled to relief from a verdict because of disallowance of voir dire only if he can prove that he was actually prejudiced by the presence of the juror in question or that the juror was properly excusable for cause." *People v Washington*, 468 Mich 667, 675; 664 NW2d 203 (2003).

In *People v Mumford*, 183 Mich App 149; 455 NW2d 51 (1990), the trial court excluded voir dire and cross-examination of the defendant's codefendant regarding his plea of guilty and agreement to testify in exchange for a reduced sentence. The trial court reasoned that the defendants had faced the same charges and any questioning on the reduced sentence would violate the general rule that a jury should not be informed of a defendant's possible punishment, if convicted. *Id*. at 151. On appeal, this Court concluded that strict adherence to the rule against informing jury of possible punishment would deprive the defendant of the right to cross-examine and present to the jury anything tending to affect the credibility of the witness, such as sentencing consideration received in return for testimony. *Id*. at 152-154. Likewise, this Court held that the trial court abused its discretion by restricting voir dire on the issue of the sentencing consideration because it prevented the development of a factual basis for the exercise of peremptory challenges. *Id*. at 154-155.

In this case, the record demonstrates that the trial court first asked each juror:

[I]f there were testimony that a person was accused of a crime, and accused of a crime that the defendants were alleged to be a part of . . . and that person decided that they wanted to plead guilty, and they wanted to testify, but in return for them being a witness against the defendants, that they got a reduced plea . . . Would you say: "I can't believe anything that person said?" Or . . . would you have an open mind?

Each juror responded that he or she would have an open mind. Next, the trial court promised to instruct the jury that it would have to be "very, very careful" and "to proceed very, very cautiously" when considering the testimony and credibility of a witness who is receiving a deal. The trial court then asked each juror if it could use such caution and each juror responded affirmatively.

Although Cain argues that the trial court's questioning regarding Rodriguez's plea was cursory and did not adequately probe for bias, he does not articulate on appeal what additional probing questions the trial court should have asked, and how different questions would have helped the parties to determine which potential jurors were impartial. See *People Orlewicz*, 293 Mich App 96, 105; 809 NW2d 194 (2011), remanded on other grounds 493 Mich 916 (2012) ("[d]efendant fails to articulate what the trial court should have asked in addition to the questions it did ask, and the trial court appears from the record to have given the attorneys the opportunity to request questions to be asked"). The trial court's questioning about whether the jury could keep an open mind about Rodriguez, but also carefully consider the credibility implications involved with his sentence agreement, is distinguishable from the dearth of questioning in *Mumford*. Moreover, Cain has not offered any evidence that he was actually prejudiced by the presence of any of the jurors or that a juror was properly excusable for cause. See *Washington*, 468 Mich at 675. Therefore, Cain has not established that the trial court abused its discretion with the scope of its own questioning.

Cain also challenges the trial court's decision to preclude defense counsel's questioning. Again, the questions defense counsel would have asked are not a matter of record or addressed by Cain on appeal. It is well-settled that a defendant does not have the right to have his attorney conduct voir dire. See MCR 6.412(C)(2) ("[t]he court may conduct the examination of prospective jurors or permit the lawyers to do so"); *Tyburski*, 445 Mich at 619 ("[d]efendant does not have a right to have counsel conduct the voir dire"). But a trial court has discretion to "permit the lawyers to supplement the examination by direct questioning or by submitting questions for the court to ask." *Id.* at 619 n 5, quoting MCR 6.412(C)(2). When the trial court precluded further questioning by defense counsel, it ruled that it had already "discussed this, thoroughly, with them." It also promised an instruction would be drafted relating to Rodriguez and how to assess his credibility.[6] In light of the trial court's discretion when conducting voir dire and Cain's failure to make a record of any additional questions that could have revealed bias

---

[6] In his brief, Cain notes that the trial court did not actually give an instruction. CJI2d 5.6 addresses accomplice testimony. Because Rodriguez did not ultimately testify, the instruction was not applicable when the trial court gave its closing instructions to the jury.

-13-

regarding Rodriguez, the trial court's refusal to allow defense counsel to ask additional questions was not outside the range of principled outcomes.

## 2. MISTRIAL

Next, Cain argues that the trial court should have granted a mistrial when Rodriguez agreed to testify—after the jury was empaneled—and later when the prosecutor refused to call him to testify. We disagree. This Court reviews a trial court's ruling on a motion for a mistrial for an abuse of discretion. *People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010).

A trial court should exercise its power to grant a mistrial with great caution and only do so when there is "an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial." *Id.* (citation and quotation marks omitted). Stated differently, a mistrial is only appropriate where the error is so egregious that its prejudicial effect can be removed in no other way. *People v Gonzales*, 193 Mich App 263, 266; 483 NW2d 458 (1992).

### a. WHEN RODRIGUEZ PLEADED GUILTY

Cain argues that his jury was tainted by the surprise of Rodriguez's plea and proposed testimony after it was empaneled. The record is clear that, when jury selection began and the jurors were empaneled, Rodriguez's plea and proposed testimony was unexpected. But as discussed earlier, the parties were not precluded from observing the jurors' potential biases on this subject because the trial court conducted voir dire about it before proceeding with trial. In light of the trial court's ruling that this questioning removed any prejudicial effect of the surprise regarding Rodriguez's plea and proposed testimony, the trial court did not abuse its discretion by denying Cain's motion for a mistrial. See *Gonzales*, 193 Mich App at 266.

### b. WHEN THE THREAT OF RODRIGUEZ'S PERJURY AROSE

Cain claims that he was entitled to a mistrial because the prosecutor promised to produce Rodriguez during her opening statement and then decided not to call him to testify. If a prosecutor refers to evidence in his opening statement that is not substantiated, reversal is warranted only if the defendant was prejudiced or the prosecutor was acting in bad faith. *People v Wolverton*, 227 Mich App 72, 77; 574 NW2d 703 (1997). Some of the prosecutor's argument about Rodriguez was cumulative. For example, even without Rodriguez's testimony, other evidence established that Tristan Cash transported Rodriguez that night to various scenes of the crimes and that Rodriguez purchased shovels and gas for defendants, which the jury could infer were used to bury the victims and burn the car used to kidnap them. Other portions of the prosecutor's argument were unsubstantiated, such as her claim that Rodriguez purchased duct tape to silence the victims and that Rodriguez saw a victim being forced into the park. These arguments did not prejudice Cain because the jury was presumed to follow the court's instructions to only decide the case based on the evidence and that the attorneys' statements were not evidence. See *Abraham*, 256 Mich App at 279. In addition, as discussed earlier, there was overwhelming evidence presented against Cain even though Rodriguez did not testify. Additionally, although Cain appears to argue that the prosecutor acted in bad faith by promising Rodriguez's testimony, nothing in the record suggests that she knew that Rodriguez would fail to comply with his plea agreement to testify truthfully and threaten to perjure himself. See *People*

*v Herndon*, 246 Mich App 371, 418; 633 NW2d 376 (2001) (noting that "[p]rosecutors . . . have a constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath" and that "Michigan courts have also recognized that the prosecutor may not knowingly use false testimony to obtain a conviction, and that a prosecutor has a duty to correct false evidence"). The trial court therefore did not abuse its discretion by failing to grant a mistrial when the prosecutor refused to call Rodriguez to testify.

Cain also makes several additional arguments related to Rodriguez's failure to testify. First, Cain argues that Rodriguez was not a res gestae witness and therefore the prosecutor had a duty to make him available for defendants to call him to testify. But a res gestae witness is " 'one who is present at the scene of the alleged crime, at the time of the alleged crime, or one who had occasion to observe the surrounding events and circumstances.' " *People v Steanhouse*, ___ Mich App ___; ___ NW2d ___ (2015) (Docket No. 318329); slip op at 7, quoting *People v Dyer*, 425 Mich 572, 577 n 4; 390 NW2d 645 (1986). According to his own allocution, Rodriguez was present during the crimes and was therefore a res gestae witness. Therefore, Cain's citation to *People v Lummis*, 260 Mich 170; 244 NW 438 (1932), for the proposition that an indorsed witness, who is not a res gestae witness, must be in court but need not be called by the prosecution, is inapposite.

Next, Cain seems to argue, with no citation to authority, that the prosecutor should have assisted him in producing Rodriguez as his witness because Rodriguez could not assert the Fifth Amendment privilege. As the prosecutor argues, Cain did not object to Rodriguez's assertion of this privilege at trial. Therefore, his argument is unpreserved and reviewed for plain error affecting substantial rights. See *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Moreover,

> [t]he Fifth Amendment to the United States Constitution and Article 1, § 17 of the Michigan Constitution provide that "[n]o person shall be compelled in any criminal case to be a witness against himself." "This prohibition 'not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.' " [*Steanhouse*, ___ Mich App at ___; slip op at 8.]

Contrary to Cain's claim, it was not inconceivable that testifying at this trial could incriminate Rodriguez in future criminal proceedings. If Rodriguez testified as the prosecutor anticipated— that he did not know the victims were in the trunk or see Lee walking toward Eliza Howell Park with a victim—he could be prosecuted for perjury because the anticipated testimony differed from his allocution. See MRE 410 (a statement made in the course of plea proceedings is admissible "in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record and in the presence of counsel"). Therefore, after Rodriguez asserted the Fifth Amendment privilege, the trial court did not commit plain error by concluding that defendants could not call Rodriguez to testify, and contrary to Cain's claim, the prosecutor did not fail to assist him in producing Rodriguez.

## D. JUDICIAL QUESTIONING

Next, Cain argues that he was prejudiced by the trial court's questioning of certain witnesses, which he claims demonstrated bias for the prosecution. We disagree.

Cain did not object to the trial court's questioning. Therefore, Cain's unpreserved arguments regarding the trial court's questioning are reviewed only to ascertain whether any plain error affected his substantial rights. See *Carines*, 460 Mich at 763-764; *People v Davis*, 216 Mich App 47, 51; 549 NW2d 1 (1996).

MRE 614(b) provides that a "court may interrogate witnesses, whether called by itself or by a party." Under this rule, "[t]he trial court may question witnesses in order to clarify testimony or elicit relevant information." *People v Conyers*, 194 Mich App 395, 404; 487 NW2d 787 (1992). The "trial court should conduct a trial with a view to eliciting the truth and to attaining justice between the parties." *Davis*, 216 Mich App at 49 (internal quotation and citation omitted). A trial judge possesses

> good reason to interject itself into the trial . . . when a witness is difficult or is not credible and the attorney fails to adequately probe the witness, . . . if a witness becomes confused," or the "attorneys for both sides avoid asking a witness a material question . . . In these and other appropriate instances, the trial court may have good reason to question a witness in order to enhance the role of the criminal trial as a search for substantive truth. [*Id*. at 49-50.]

A trial judge does not deprive a defendant of a fair trial by asking "questions posed in a neutral manner." *Id*. at 50.

"The principal limitation on a court's discretion over matters of trial conduct is that its actions not pierce the veil of judicial impartiality." *Id.* In *Conyers*, 194 Mich App at 405, this Court summarized the following relevant cautionary principles governing judicial questioning of witnesses:

> [T]he trial court must exercise caution and restraint to ensure that its questions are not intimidating, argumentative, prejudicial, unfair, or partial. The test is whether the judge's questions and comments may well have unjustifiably aroused suspicion in the mind of the jury as to a witness'[s] credibility, and whether partiality quite possibly could have influenced the jury to the detriment of defendant's case. [Internal quotations, citations and emphasis omitted.]

"A trial court may not assume the prosecutor's role with advantages unavailable to the prosecution," but "the fact that testimony elicited by a court's questions damaged a defendant's case did not demonstrate that the court had improperly assumed the role of surrogate prosecutor." *Davis*, 216 Mich App at 51 (internal quotation and citation omitted).

This was a long and complicated trial, which was conducted over a period of many weeks and involved many parties and pieces of evidence. The trial court's questioning of Chapman elicited testimony, which he had previously struggled to explain clearly. Likewise, the trial court questioned evidence technician, Mary Gross, about details of her evidentiary findings that the

parties had failed to adequately probe. As even Cain notes, on one occasion the trial court began to interject about the location of a shell casing and duct tape where the victims were buried, but when the prosecutor promised to continue that line of questioning, the trial court exercised restraint and allowed the prosecutor to fulfill her role. Cain only argues that some of the evidence elicited by the judge could have led to an inference of guilt. But the same evidence also could have created reasonable doubt.[7] Regardless, the trial court instructed the jury only to decide the case based on the evidence and, "My comments, rulings, questions and instructions are . . . not evidence." Because the jury was presumed to follow its instructions, Cain cannot establish a plain error affecting his substantial rights from the trial court's questioning. See *Abraham*, 256 Mich App at 279.[8]

### III. DOCKET NO. 314712 – R. BROWN'S APPEAL

### A. RODRIGUEZ

Like Cain, R. Brown also argues that the trial court should have granted a mistrial because the prosecutor promised to produce Rodriguez during her opening statement and then decided not to call him to testify. R. Brown does not argue that the prosecutor acted in bad faith, but rather that he was nevertheless prejudiced by her unsubstantiated argument. We disagree. Again, this Court reviews a trial court's ruling on a motion for a mistrial for an abuse of discretion. *Schaw*, 288 Mich App at 236.

Any prejudice from the prosecutor's unsubstantiated argument was not so egregious that its effect could not be removed in another way. See *Gonzales*, 193 Mich App at 266. Again, the jury is presumed to have followed the instructions that the case could only be decided based on the evidence and that the attorneys' statements were not evidence. *Abraham*, 256 Mich App at 279. Moreover, in light of the overwhelming evidence against R. Brown, any additional promises that Rodriguez would further implicate him were not outcome determinative. The text messages between R. Brown and J. Brown establish their plan of "hittin' that lick," which required a gun and a car. The very next day, R. Brown's cell phone placed him in the Hamtramck neighborhood at the time of the kidnapping and shooting at Chapman's home. From R. Brown's subsequent statement that he "almost got [his] f**kin' head blown off," the jury could infer that he was involved in the crossfire between Cain and Chapman. After the kidnapping, the victims reported that they were inside a silver Chrysler Sebring and R. Brown was seen driving a green or gray Chrysler Sebring that night. In addition, cellular phone tower

---

[7] For example, Cain argues that the trial court's elicitation of evidence that Chapman was never formally introduced to Cain made Cain look "shifty, antisocial, and suspect," but the jury could have just as easily inferred that, absent an introduction, Chapman did not know Cain well enough to recognize him as the shooter during the kidnapping.

[8] Although Cain references the sentencing transcript from the trial involving the February 8 shooting to demonstrate the trial court's bias, any statements the trial court made in that proceeding are not part of the instant record and will not be considered on appeal. See *Reeves v K-Mart Corp*, 229 Mich App 466, 481 n 7; 582 NW2d 841 (1998).

usage immediately after the kidnapping showed R. Brown's phone was moving in the same direction as the victims' phones. The victims were shot and buried in Eliza Howell Park and the jury could infer that R. Brown shot them and dug their graves because he arrived at Raymon's nearby house later, covered in mud, with a gun he needed to clean and bullets he wanted to dispose of. He also carried one of the victim's purses. When Rodriguez joined him at Raymon's house, R. Brown requested a gas can filled with gas. The silver Chrysler Sebring was parked on Bramell Street at the time. Just after R. Brown left the home, emergency vehicles responded to Bramell Street to control a fire involving a silver Chrysler; a gas can sat nearby. In the aftermath of the kidnapping and murders, R. Brown texted demands to be paid to Rodriguez, inquired what Richbow saw and what should be done to her, and threatened to kill Cash for being a "snitch." Given these facts linking R. Brown to the crimes, any mention of Rodriguez's proposed testimony about his involvement in the crimes did not affect R. Brown's right to a fair trial.

R. Brown also argues on appeal that reversal is required because the prosecutor withheld potentially exculpatory information revealed during Rodriguez's interview. We disagree.

Due process demands that a criminal defendant have "a meaningful opportunity to present a complete defense," which includes a defendant's receipt of exculpatory evidence. *People v Anstey*, 476 Mich 436, 460; 719 NW2d 579 (2006). A prosecutor must disclose exculpatory and material evidence in his or her possession, regardless of whether the defendant has asked for the disclosure. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007). R. Brown cites *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), under which a defendant must prove:

> (1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material. [*People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014).]

In addition, when evidence is lost or not preserved and the exculpatory value of the evidence is indeterminate and only potentially useful, a defendant must show that the government acted in bad faith in failing to preserve the evidence. *Arizona v Youngblood*, 488 US 51, 57-58; 109 S Ct 333; 102 L Ed 2d 281 (1988); *People v Johnson*, 197 Mich App 362, 365; 494 NW2d 873 (1992).

In this case, after the prosecutor interviewed Rodriguez and declined to call him to testify because she anticipated that he would perjure himself, Rodriguez asserted his Fifth Amendment right to silence and the trial court ruled that he could not be called as a witness at trial. Therefore, even assuming that the prosecutor possessed and suppressed evidence favorable to defendants, the outcome of the trial would not have been different because Rodriguez's testimony could not have been presented. See *Chenault*, 495 Mich at 156. Therefore, any alleged suppression of evidence would not require reversal.

## B. CELL PHONE RECORDS

Like J. Brown and Cain, R. Brown also argues that the trial court abused its discretion when admitting the cell phone records associated with him, arguing that the records were not sufficiently authenticated. We disagree.

Again, to admit evidence, a proper foundation must be established. The "articles [must] be identified as that which they purport to be and that the articles are shown to be connected with the crime or with the accused." *Furman*, 158 Mich App at 331; MRE 901(a).

When he was interviewed by the police, R. Brown told Officer Alejandro Parra that his phone number was ***-***-8929. As R. Brown argues, there is no evidence in the record from an eyewitness identifying him as the user of that phone number at the time of the charged crimes. But Jaehnig's testimony regarding the towers utilized by ***-***-8929 around that time allowed the jury to infer that it was R. Brown making and receiving calls and texts. Most importantly, ***-***-8929 was utilized in the Eliza Howell Park area when Richbow confirmed that R. Brown was with her in that same area. That the tower usage showed that the phone returned to R. Brown's neighborhood on Beresford—after R. Brown's visit to Richbow and the car fire— also allowed the jury to infer that it was R. Brown making and receiving calls and texts.

Again, the foundation need not have identified R. Brown as the user with absolute certainty. That R. Brown offered evidence that his friends did not know he could be reached at ***-***-8929,[9] and that the subscription was taken in California,[10] was evidence the jury could consider when assessing the weight to be given to the phone records, not their admissibility. Therefore, the trial court did not abuse its discretion by concluding that the prosecutor introduced evidence to establish a proper foundation for the admission of cellular phone records for ***-***-8929.

## IV. DOCKET NO. 316110 – LEE'S APPEAL

### A. SUFFICIENCY OF THE EVIDENCE

Lee argues that he was merely present during the crimes and the prosecutor failed to establish his convictions of second-degree murder beyond a reasonable doubt. We disagree.

"The elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). Lee only challenges the second element that he played any role in causing the victims' deaths.

The prosecutor offered evidence at trial that, on February 8, 2012, Cain ordered Lee to shoot at the victims as they fled in Brown's car. The jury could therefore infer that, in addition to Cain, Lee had a motive to silence the victims. See *Unger*, 278 Mich App at 223-224 (evidence of motive and opportunity are logically relevant in a prosecution for murder). But contrary to Lee's claims, his motive was not the only fact connecting him to the murders. The record demonstrated that Cain gave Douglas money for safe-keeping, and both Cain and Lee went together to retrieve that money from Douglas on the night of the kidnapping; the jury could

---

[9] Their phone records nevertheless showed calls to ***-***-8929.

[10] Jaehnig testified that Irvine California is the location used on an account when a subscriber refuses to provide an address.

-19-

infer that the money was to pay their accomplices. In addition, Cash observed a man with braids with Cain, R. Brown, and Rodriguez by the trunk of the Chrysler Sebring (both open and shut) after the kidnapping. The jury could infer that the man with braids with this group was Lee, because Lee had braids at the time and he was identified shortly afterward by Douglas with the same group of three men and cars at Douglas's father's house. In addition, cell phone records demonstrated that Conaway, R. Brown, and Lee used their phones about a half hour after the kidnapping in the same geographical location. Again, the victims were subsequently buried in Eliza Howell Park. Cell phone records demonstrated that Lee was in this area for about two hours after the kidnapping. Rodriguez delivered shovels there to the same group of men. Moreover, the jury could infer that Lee assisted with the burial and was not merely present in the area because, like R. Brown who was covered in mud, Lee's socks were dirty afterward. Furthermore, Lee exhibited consciousness of guilt when he and Cain went to Glenn's house after the burial and he nervously looked out the window. See *People v Kowalski*, 489 Mich 488, 509 n 37; 803 NW2d 200 (2011) ("attempts to conceal involvement in a crime are probative of a defendant's consciousness of guilt").

Lee attempts to chip away at the evidence supporting his convictions by arguing that there was no physical evidence, such as fingerprints or DNA, connecting him to the crimes and claiming that the identification of him as the February 8 shooter was uncertain. But these questions of fact were within the exclusive province of the jury and will not be second-guessed on appeal. See *Gadomski*, 232 Mich App at 28.

Last, Lee also claims that the jury's verdict finding him guilty of second-degree murder was inconsistent with the trial court's dismissal of the unlawful imprisonment charge and the jury's verdict finding him not guilty of torture. Similarly, Lee questions the jury's conclusion that Cain was guilty of first-degree murder while merely finding him guilty of second-degree murder. But a jury may render inconsistent verdicts. *People v Wilson*, 496 Mich 91, 100-101; 852 NW2d 134 (2014); *People v Vaughn*, 409 Mich 463, 464; 295 NW2d 354 (1980). Because there was sufficient evidence to support the jury's conclusion that the victims' deaths were caused by Lee, any alleged inconsistency regarding the verdicts does not require reversal.

## B. RODRIGUEZ

Just like Cain and R. Brown, Lee argues that the trial court should have granted a mistrial because the prosecutor promised to produce Rodriguez during her opening statement and then decided not to call him to testify. Lee does not argue that the prosecutor acted in bad faith, but rather that he was nevertheless prejudiced by her unsubstantiated argument.[11] We disagree. Again, this Court reviews a trial court's ruling on a motion for a mistrial for an abuse of discretion. *Schaw*, 288 Mich App at 236.

---

[11] Citing *Baker v State*, 906 A2d 139, 148 (Del, 2006) ("[i]f the Court determine[s] that no misconduct occurred, [the] analysis should end there"), the prosecutor argues that error requiring reversal should only occur when the prosecutor acted in bad faith. But this Court is not bound by decisions in other states and the holding in *Wolverton*—that either prejudice or the prosecutor's bad faith can require reversal—remains good law. *Wolverton*, 227 Mich App at 77.

Lee cites *Wolverton*, 227 Mich App at 75-78, where this Court vacated the defendant's conviction for operating a vehicle under the influence of intoxicating liquor (requiring a blood alcohol level of .10 or higher) based on the prosecutor's reference in the opening statement to the incriminating results of a blood alcohol test (showing a BAC of .19 and .20), which were ultimately held inadmissible. The prosecutor apparently made the reference in good faith. And the remaining evidence merely demonstrated a credibility contest between the arresting officer and the defendant and his witnesses. The arresting officer testified that he observed the defendant drive erratically, exit his car, stumble to a barn where he pretended to work, smell of intoxicants, slur his speech, and fail a field sobriety test. *Id.* at 73. On the other hand, the defendant denied drinking, which was supported by several coworkers and family members who had been with him. The witnesses also testified that the defendant worked with a strong-smelling glue, which was on his clothing on the day of the arrest. In addition, the booking officer testified that the defendant was agitated, but the booking sheet stated that he did not appear to be under the influence of drugs or alcohol. The defendant claimed that he ran into the barn and pretended to be working because he was driving with a suspended license, and he testified that the arresting officer did not conduct field sobriety tests. *Id.* at 74. This Court ruled on appeal that, given the credibility contest, the "damning, and subsequently unproved, allegation that [the] defendant's blood alcohol content was twice the legal limit, was so prejudicial as to require the declaration of a mistrial in order to assure [the] defendant a fair trial." *Id.* at 77.

Any prejudice from the prosecutor's unsubstantiated argument was not so egregious that its effect could not be removed in another way. See *Gonzales*, 193 Mich App at 266. In his attempt to show prejudice, Lee's argument is somewhat misleading. Lee quotes a substantial portion of the prosecutor's opening statement, in which she asserted that she would produce evidence (1) that Lee was with Cain, R. Brown, and Rodriguez on the night of the crimes, (2) that someone, who she did not name, forced one of the victims at gunpoint into the park, and (3) allowing the jury to infer Lee's active participation in the crimes, including his motive to silence the victims and circumstantial evidence, such as his dirty socks. In his brief, Lee then recounts a fact from Rodriguez's allocution, which was never presented or argued to the Cain/Lee jury, that Lee was the person forcing the victims into the park. Lee claims that this fact from the allocution, making an eyewitness link to his participation, is comparable to the prejudicial BAC levels in *Wolverton*. But, again, the prosecutor did not make this specific eyewitness link to Lee's participation. As discussed earlier, many of the facts promised in the prosecutor's argument were established without Rodriguez's testimony at trial. In addition, as discussed repeatedly throughout this opinion, the jury is presumed to have followed the instructions that the case could only be decided based on the evidence and that the attorneys' statements were not evidence. *Abraham*, 256 Mich App at 279. Because Lee has failed to establish that any prejudice from the prosecutor's unsubstantiated argument was so egregious that its effect could not be removed in another way, it was not outside the range of principled outcomes to deny Lee's motion for a mistrial. See *Gonzales*, 193 Mich App at 266.

## C. SENTENCING DEPARTURE

Lee next argues that the trial court erred by departing from the sentencing guidelines range of 270 to 450 months for the second-degree murder convictions, arguing that the trial court failed to identify substantial and compelling reasons to justify a departure, or the extent of the

departure.  In *People v Lockridge*, 498 Mich 358, 364-365; 870 NW2d 502 (2015), our Supreme Court recently held that a trial court is no longer required to provide a substantial and compelling reason for a departure from the sentencing guidelines.  Thus, review of defendant's specific arguments concerning whether the reasons articulated by the trial court were substantial and compelling is unnecessary.  Instead, under *Lockridge*, an appellate court must review a departure sentence for reasonableness.  *Id.* at 392.

In *Steanhouse*, ___Mich App at ___; slip op at 23-25, this Court adopted the pre-statutory-sentencing-guidelines principle of proportionality test in *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990), to define reasonableness, explaining:

> Under the new test, "a given sentence [could] be said to constitute an abuse of discretion if that sentence violate[d] the principle of proportionality, which require[d] sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id.* at 636.  As such, trial courts were required to impose a sentence that took "into account the nature of the offense and the background of the offender." [*Milbourn*, 435 Mich] at 651.

> With regard to the judicial sentencing guidelines, the [*Milbourn*] Court stated:

>> The guidelines represent the actual sentencing practices of the judiciary, and we believe that the second edition of the sentencing guidelines is the best "barometer" of where on the continuum from the least to the most threatening circumstances a given case falls.

>> . . . We note that departures [from the guidelines] are appropriate where the guidelines do not adequately account for important factors legitimately considered at sentencing . . . .  To require strict adherence to the guidelines would effectively prevent their evolution, and, for this reason, trial judges may continue to depart from the guidelines when, in their judgment, the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime. [*Id.* at 656-657.]

> The Court also provided the following guidance for appellate courts reviewing a departure from the guidelines:

>> Where there is a departure from the sentencing guidelines, an appellate court's first inquiry should be whether the case involves circumstances that are not adequately embodied within the variables used to score the guidelines.  A departure from the recommended range in the absence of factors not adequately reflected in the guidelines should alert the appellate court to the possibility that the trial court has violated the principle of

-22-

proportionality and thus abused its sentencing discretion. Even where some departure appears to be appropriate, the extent of the departure (rather than the fact of the departure itself) may embody a violation of the principle of proportionality. [*Id*. at 659-660.]

Factors previously considered by Michigan courts under the proportionality standard included, among others, (1) the seriousness of the offense, *People v Houston*, 448 Mich 312, 321; 532 NW2d 508 (1995); (2) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, *id*. at 323; *Milbourn*, 435 Mich at 660, the defendant's misconduct while in custody, *Houston*, 448 Mich at 323, the defendant's expressions of remorse, *id*., and the defendant's potential for rehabilitation, *id*.; and (3) factors that were inadequately considered by the guidelines in a particular case, *id*. at 324.

In *Steanhouse*, this Court also provided procedural instructions for this circumstance, where a defendant was sentenced before our Supreme Court's decision in *Lockridge* and the trial court departed from the guidelines, relying on the previous substantial and compelling standard. This Court stated:

Given that *Lockridge* overturned the substantial and compelling reason standard . . . which was in place at the time of defendant's sentencing, and given our conclusion that the principle of proportionality established under *Milbourn* and its progeny is now the appropriate standard by which a defendant's sentence should be reviewed, we also find that the procedure articulated in *Lockridge*, and modeled on that adopted in *United States v Crosby*, 397 F3d 103 (CA 2, 2005), should apply here. As recently stated by this Court in *People v Stokes*, ___ Mich App ___, ___; ___NW2d ___ (2015); slip op at 11, "the purpose of a *Crosby* remand is to determine what effect *Lockridge* would have on the defendant's sentence, so that it may be determined whether any prejudice resulted from the error." While the *Lockridge* Court did not explicitly hold that the *Crosby* procedure applies under the circumstances of this case, we conclude this is the proper remedy where, as here, the trial court was unaware of and not expressly bound by a reasonableness standard rooted in the *Milbourn* principle of proportionality at the time of sentencing.

Under the *Crosby* procedure, which "offers a measure of protection to a defendant[,]" "a defendant is provided with an opportunity 'to avoid resentencing by promptly notifying the trial judge that resentencing will not be sought.' " Given the possibility that defendant could receive a more severe sentence, defendant should be provided the opportunity to avoid resentencing if that is his desire. Accordingly, we remand the matter to the trial court to follow the *Crosby* procedure outlined in *Lockridge*. Defendant "may elect to forego resentencing by providing the trial court with prompt notice of his intention to do so. If 'notification is not received in a timely manner,' the trial court shall continue with the *Crosby* remand procedure as explained in *Lockridge*." [*Steanhouse*, ___ Mich App at ___; slip op at 25 (citations omitted).]

Thus, in accordance with *Lockridge* and *Steanhouse*, we remand this case to the trial court for a *Crosby* hearing, including "permitting the sentencing judge to determine whether to resentence, now fully informed of the new sentencing regime, and if so, to resentence." *Lockridge*, 498 Mich at 396.

## D. JURY'S OATH

In a supplemental brief, Lee argues that structural error occurred when the trial court clerk read the incorrect oath to the Cain/Lee jury. We disagree. This issue is unpreserved because Lee did not object to the trial court's swearing of the jury at trial. Because this issue is unpreserved, review is for plain error affecting substantial rights. *Carines*, 460 Mich at 763. Even if a defendant succeeds in establishing a plain error that affects substantial rights, an appellate court must still exercise discretion in deciding whether to reverse, and "relief is warranted only when the court determines that the plain, forfeited error resulted in the conviction of an actually innocent defendant or 'seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings.' " *People v Cain*, 498 Mich 108, 116; 869 NW2d 829 (2015) (internal quotations and citation omitted).

Codefendant Cain, who shared the same jury with Lee, previously raised this issue in a motion for peremptory reversal. This Court granted the motion, *People v Cain*, unpublished order of the Court of Appeals, issued May 2, 2014 (Docket No. 314342), and the prosecutor appealed that decision. The Michigan Supreme Court thereafter vacated this Court's order, reinstated Cain's convictions and sentences, and remanded the case to this Court for consideration of Cain's remaining claims on appeal. *Cain*, 498 Mich at 112. The Supreme Court observed that Cain "does not even argue that he is actually innocent," *id.* at 119, and concluded that because the jurors were conscious of the gravity of the task before them and the manner in which that task was to be carried out, the two primary purposes served by the juror's oath, the error of failing to properly swear the jury in this case did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings. *Id.* at 126-128. Therefore, reversal was not warranted. *Id.* at 128.

Lee similarly does not argue that he is actually innocent. Further, because Lee and Cain shared the same jury, the Supreme Court's conclusion in *Cain* that the error of failing to properly swear the jury did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings, applies equally to Lee. Therefore, reversal is not warranted.

## V. DOUBLE JEOPARDY

J. Brown, R. Brown, and Lee argue that their right against double jeopardy was violated because they were convicted of four counts of murder for the deaths of just two victims. We agree.

The Double Jeopardy Clause protects against multiple punishments for the same offense, US Const, Am V; Const 1963, art 1, § 15. *Matuszak*, 263 Mich App at 49. In *Orlewicz*, 293 Mich App at 112, this Court explained:

[C]onvicting a defendant of both first-degree premeditated murder and first-degree felony murder arising out of the death of a single victim is a violation of

-24-

double-jeopardy protection. *People v Williams*, 265 Mich App 68, 72; 692 NW2d 722 (2005). We will uphold a single conviction for murder based on two alternative theories. *Id.* Accordingly, the proper remedy when a defendant is convicted of both first-degree premeditated murder and first-degree felony murder arising out of the death of a single victim is to modify the conviction to specify that it is for a single count of first-degree murder supported by two theories.

J. Brown and R. Brown were each convicted and sentenced for two counts of both first-degree premeditated murder and first-degree felony murder, arising out of the deaths of both Conaway and Brown, totaling four separate convictions and sentences. Therefore, remand is necessary to correct their judgments of sentence to show a single conviction of first-degree murder for both Conaway and Brown, each supported by two different theories. Cain was similarly sentenced for four first-degree murder convictions and, although he does not raise the same claim on appeal, in the interest of consistency and equal justice, we remand his case with the same instruction for the trial court. See MCR 7.216(A)(7).

Lee's convictions are distinct because, although he was charged with first-degree premeditated murder and first-degree felony murder for each victim, the jury convicted him of the lesser crime of second-degree murder for each count. In any event, because these convictions also resulted in two convictions and sentences for the death of each victim, we likewise remand Lee's case for correction of his judgment of sentence showing a single conviction of second-degree murder for both Conaway and Brown.

We remand for correction of the judgments of sentence to vacate defendants' duplicative murder convictions and sentences, and remand for a *Crosby* hearing regarding Lee's departure sentences in accordance with this opinion, but defendants' convictions and sentences in all other respects are affirmed. We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly

-25-